**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>CHRISTOPHER ROBERT PALECKI,<br><br>Debtor. | Bankruptcy Case No. 23-14285 TBM<br>Chapter 13 |
| DAWN MCNULTY<br>JACOB MCNULTY,<br><br>Plaintiffs,<br><br>v.<br><br>CHRISTOPHER ROBERT PALECKI,<br><br>Defendant. | Adv. Pro. No. 23-1267 TBM |

---

**MEMORANDUM OPINION AFTER TRIAL**

---

## I.    Introduction.

Bankruptcy provides a temporary safe haven for "honest but unfortunate debtor[s]"[1] so that they "can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt."[2]  The foundation of American insolvency law is the possibility of a discharge which provides a "fresh start" — an economic second chance which acts as a sort of safety valve in our capitalist system. However, not all debtors are entitled to a discharge.  The Bankruptcy Code[3] "has long prohibited debtors from discharging liabilities incurred on account of their fraud . . . ."[4] Those few debtors who engage in pre-bankruptcy dishonesty (including false pretenses,

---

[1]     *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991); *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) ("The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'").

[2]     *Grogan,* 498 U.S. at 286 (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (internal quotation omitted)).

[3]     11 U.S.C. § 101 *et seq.*  Unless otherwise indicated, all references to "Section" are to Sections of the Bankruptcy Code.

[4]     *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998).

false representations, or actual fraud), embezzlement, or willful and malicious injury must continue to bear responsibility for the damages resulting from their misconduct.

This Adversary Proceeding arises from a construction contract gone awry. Creditors-Plaintiffs Dawn McNulty ("Mrs. McNulty") and Jacob McNulty ("Mr. McNulty") (together, the "McNultys") own a historic residential property located in the Baker Historic Community at 153 West First Avenue, Denver, Colorado (the "Property"). The Property consists of a primary residence along with an unattached carriage house (the "Carriage House"). The Carriage House was originally designed to protect a horse-drawn carriage (and perhaps some horses). After renovating the primary residence some years ago, the McNultys turned their sights to the Carriage House which was then not usable. They wanted to renovate, repair, and reconstruct the Carriage House so that it could serve as an automobile garage (on the ground level) as well as an additional small residence (commonly referred to as an accessory dwelling unit or "ADU") on the upper level (the "Carriage House Project"). The McNultys aimed to preserve the historic nature of the Carriage House — knowing that doing so would be complex, time-consuming, and expensive.

The McNultys entered into a contract with Christopher Construction, Inc. ("CCI"), an entity wholly-owned by Chapter 13 Debtor-Defendant Christopher Robert Palecki (the "Debtor"), to complete the Carriage House Project. As part of their arrangement, the McNultys put down a $59,375.00 deposit (the "Deposit") with CCI (calculated as approximately twenty-five percent (25%) of the aggregate contract price for the job). It did not go well. For various reasons (including a lengthy City and County of Denver permitting process), CCI did not rebuild the Carriage House; and CCI did not return the Deposit to the McNultys either. In fact, CCI (at the Debtor's direction) spent the entire Deposit shortly after the contract was signed and before any reconstruction work started on the Carriage House Project. Not surprisingly, the McNultys want their money back (along with interest, treble damages, and attorneys' fees).

The Debtor filed for Chapter 13 bankruptcy protection and CCI went out of business. Although the Debtor's confirmed Chapter 13 Plan projects paying the McNultys the amount of the Deposit and a little more over five years, the McNultys have requested that the full asserted debt also be determined to be nondischargeable as against the Debtor under Sections 523(a)(2)(A) ("false pretenses, false representations, or actual fraud"), 523(a)(4) ("embezzlement"), and/or 523(a)(6) ("willful and malicious injury") of the Bankruptcy Code. The Debtor contests nondischargeability.

Accordingly, this dispute requires the Court to decide: (1) whether the Debtor owes a debt to the McNultys and, if so, how much; and (2) whether such debt is nondischargeable under Sections 523(a)(2)(A), 523(a)(4), and/or 523(a)(6). The Court conducted a trial during which the Debtor and the McNultys testified. The Court also admitted voluminous exhibits into evidence. Having considered the facts and the law, and for the reasons set forth below, the Court determines that the McNultys satisfied their burden of proof. Accordingly, the debt owned by the Debtor is nondischargeable.

## II.     Jurisdiction and Venue.

The Court has jurisdiction to enter final judgment in this nondischargeability dispute pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) (allowance or disallowance of claims against the estate); 157(b)(2)(I) (determinations as to the dischargeability of particular debts); 157(b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship).  Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.  The McNultys and the Debtor agree that this Court has jurisdiction to enter judgment and that venue is proper in the Court.

## III.     Procedural Background.

## A.     The Debtor's Main Bankruptcy Case.

The Debtor initiated his main bankruptcy case under Chapter 13 of the Bankruptcy Code on September 22, 2023 by filing his Petition.[5]  When the Debtor filed his Petition and related Statement of Financial Affairs and Schedules, he scheduled the McNultys as holding a debt in the amount of $54,775.00.[6]  He did not check the boxes to indicate that the debt was "contingent, unliquidated or disputed."[7]

The Debtor proposed an "Amended Chapter 13 Plan" (the "Plan") to pay his creditors, including the McNultys.[8]  In the Plan, the Debtor committed to pay "a 100% payout to all timely filed Class Four Claims."[9]  On January 29, 2024, the Court confirmed the Plan under Section 1325.[10]  The McNultys filed a claim, Proof of Claim No. 6-1, on November 7, 2023 (the "McNulty Claim") in the amount of the Deposit (59,375.00).[11]  Later, they amended the McNulty Claim (Claim No. 6-2, the "Amended McNulty Claim") to include additional amounts for treble damages, attorneys' fees and costs in the aggregate of $260,597.68.[12]  The Debtor did not object to the amount of the Amended McNulty Claim.  Accordingly, per Section 502(a), the Amended McNulty Claim currently "is deemed allowed."

## B.     The Adversary Proceeding.

On December 18, 2023, the McNultys commenced this Adversary Proceeding by filing their "Complaint for Determination that Debt is Not Dischargeable" (the

---

[5]     Main Case Docket No. 1.  The Court will refer to documents filed in the CM/ECF docket sheet for this Adversary Case, Adversary Proceeding No. 23-1267 TBM by citing to "Docket No.____."  At times this Court will also refer to documents filed in the Debtor's Main Case, *In re Palecki*, Case No. 23-14285 TBM (Bankr. D. Colo.) (the "Main Case").  When doing so, the Court will refer to documents filed in the CM/ECF docket sheet for the Main Case by citing to "Main Case Docket No. _____."; Ex. 18.
[6]     Ex. 18 at 28.
[7]     *Id.*; Main Case Docket No. 1 at 28.
[8]     Main Case Docket No. 39.
[9]     *Id.* at Part 12.
[10]    Main Case Docket No. 45.
[11]    Ex. 20.
[12]    Ex. 21.

"Complaint").[13]  A few months later, the McNultys moved to amend their Complaint.[14]
The Court granted their motion to amend the Complaint.[15]  So, on March 6, 2024, the
McNultys filed their "First Amended Complaint for Determination that Debt is Not
Dischargeable" (the "Amended Complaint").[16]  The Amended Complaint is the operative
complaint.  In the Amended Complaint, the McNultys asserted the following claims for
relief:

- First Claim for Relief: "Exception to Discharge for Money obtained
  by False Pretenses, a False Representation or Actual Fraud-Fraudulent
  Misrepresentation/Inducement — 11 U.S.C. § 523(a)(2)";

- Second Claim for Relief: "Exception to Discharge for Money obtained by
  False Pretenses, a False Representation or Actual Fraud-Fraudulent
  Concealment — 11 U.S.C. § 523(a)(2)";

- Third Claim for Relief: "Exception to Discharge for Money obtained by
  False Pretenses, a False Representation or Actual Fraud-
  Conversion/Civil Theft, C.R.S. 18-4-405 — 11 U.S.C. §§ 523(a)(2), (4),
  (6)";

- Fourth Claim for Relief: "Exception to Discharge for Fraud or Defalcation
  While Acting in a Fiduciary Capacity — 11 U.S.C. § 523(a)(4)";

- Fifth Claim for Relief: "Exception to Discharge for Embezzlement — 11
  U.S.C. 523(a)(4)"; and

- Sixth Claim for Relief: "Exception to Discharge for Willful and Malicious
  Injury — 11 U.S.C. § 523(a)(6)."

Thereafter, the Debtor filed an "Answer" to the Amended Complaint contesting all of the
claims for relief asserted in the Amended Complaint and advancing a few affirmative
defenses (the "Answer").[17]

On August 23, 2024, the McNultys filed a "Motion for Summary Judgment" (the
"MSJ").[18]  In the MSJ, the McNultys requested judgment in their favor and against the
Debtor on only the Third and Fifth Claims for Relief stated in the Amended Complaint.
So, in that sense, the McNultys asked only for partial summary judgment.  The MSJ
complied with the applicable procedural requirements including identifying a set of 49
alleged "undisputed facts" each of which were supported by citations to "particular parts
of materials in the record, including depositions, documents . . . affidavits . . .

---

[13]     Docket No. 1.
[14]     Docket No. 18.
[15]     Docket No. 19.
[16]     Docket No. 21.
[17]     Docket No. 22.
[18]     Docket No. 34.

admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c) and (e); *see also* L.B.R. 7056-1(a)-(d).

Thereafter, the Debtor filed a "Response" to the MSJ (the "MSJ Response").[19] Although the Debtor purported to deny some of the 49 "undisputed facts" presented by the McNultys, the Debtor did not comply with the applicable procedural requirements because the Debtor did not support any of his denials of "undisputed facts" with citations to "particular parts of materials in the record, including depositions, documents . . . affidavits . . . admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c) and (e); *see also* L.B.R. 7056-1(a)-(d).  Accordingly, the Court decided: "as dictated by Fed. R. Civ. P. 56(e)(2) and L.B.R. 7056-1(d), each of the McNultys' Statements of [49] Undisputed Facts is deemed admitted for purposes of the MSJ."[20]

Notwithstanding that the Debtor effectively admitted all of the 49 "undisputed facts" presented by the McNultys and presented an extremely anemic legal argument, the Court carefully considered whether summary judgment was warranted.  In its "Order Denying Motion for Partial Summary Judgment," the Court concluded:

> The McNultys have failed to meet their burden to establish all the elements required to prevail on either their Fifth and Third Claims for Relief.  The Undisputed Facts do not include sufficient facts to establish the required elements of intent for either embezzlement or for civil theft under the Colorado Civil Theft Statute by a preponderance of the evidence.
>
> The Undisputed Facts, however, establish that there is a "debt" for purposes of the Section 523 two-part analysis. The Debtor has admitted his liability to the McNultys for the Judgment Amount.  Pursuant to the authority provided by Rule 56(g), the Court will treat the debt as established for purposes of the case, and the trial to the extent of $65,419.52.  The dischargeability component remains for trial.  Accordingly, the Court:
>
> ORDERS that the McNultys' Motion for Summary Judgment (Docket No. 34) is DENIED;
>
> FURTHER ORDERS that the debt component of the McNultys' Section 523(a) Claims for Relief is established in the case pursuant to Rule 56(g); and
>
> FURTHER ORDERS that the Amended Complaint and Answer will proceed to trial as set for two days to commence

---

[19]     Docket No. 37.
[20]     Docket No. 43 at 6.

on October 7, 2024 . . . .[21]

In the lead-up to trial, the Court conducted a Final Pretrial Conference during which counsel for the McNultys made an oral motion pursuant to Fed. R. Civ. P. 56(g) and Fed. R. Bankr. P. 7056 for the Court to consider the "undisputed facts" presented by the McNultys in the MSJ as uncontested and established for purposes of the trial.[22] Counsel for the Debtor did not contest such request.[23] Accordingly, the Court granted the oral motion and ruled that all the "undisputed facts" set forth in the MSJ were "established for purposes of the trial" and "admitted into evidence."[24] The Court also reconfirmed that the McNultys had established a debt owed by the Debtor in the amount of at least $65,419.52.[25] For their part, the McNultys also agreed that they were "not pursuing a claim against the Debtor for violation of the Colorado Trust Fund Statute (also known as the Mechanics Lien Statute) C.R.S. § 38-22-127."[26] Meanwhile, the McNultys and the Debtor submitted a series of: pre-trial statements; statements of issues in dispute; stipulations; notices; and legal briefs.[27]

The Court conducted a two-day trial on the Amended Complaint and Answer on October 7 and 8, 2024. At the trial, the Court heard opening statements from counsel for the McNultys and the Debtor followed by the testimony of three witnesses: the Debtor; Mrs. McNulty; and Mr. McNulty. The Court also admitted into evidence: McNulty Exhibits 1-10, 12-13, 18, 20-22, 24-25, 28-29, and 116-118; and Debtor Exhibits B, C, and D. After the conclusion of the evidence, the Court heard fulsome closing argument from counsel for the McNultys and the Debtor. During closing argument, counsel for the McNultys confirmed that the McNultys were no longer pursuing the Fourth Claim for Relief: "Exception to Discharge for Fraud or Defalcation While Acting in a Fiduciary Capacity — 11 U.S.C. § 523(a)(4)."[28] Thus, that claim is no longer at issue.

The Court, having considered the evidence presented at trial (including the testimony and admitted exhibits) and the arguments presented by the parties at trial and in their legal briefs, determines that the dispute is ripe for decision. The Court notes the professionalism and capable advocacy of counsel for both the McNultys and the Debtor.

## IV.   Findings of Fact.

The Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052, based upon the evidence presented at the trial

---

[21]   *Id.* at 21-22.
[22]   Docket No. 44 at 1-2.
[23]   *Id.* at 2.
[24]   *Id.*
[25]   *Id.*
[26]   *Id.*
[27]   Docket Nos. 40, 41-42, 45, 48-50.
[28]   Tr. II at. 29-30. The Court Reporter prepared verbatim transcripts of the trial. Docket Nos. 57-60. The Court refers to the transcript of proceedings conducted on October 7, 2024 as "Tr. I at ___." The Court refers to the transcript of proceedings conducted on October 8, 2024 as "Tr. II at ___."

(including testimony and admitted exhibits) and the "Undisputed Facts" (identified below).  To the extent that the Court's identification of the foregoing Procedural Background is factual in nature (that is identifying what occurred in the Main Case and this Adversary Proceeding), the Court also incorporates the foregoing Procedural Background as part of the Court's factual findings.  The Court also takes judicial notice of the Docket in the Main Case and this Adversary Proceeding.  *See St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) (court may *sua sponte* take judicial notice of its own docket).

## A.   <u>Findings of Fact Based on Undisputed Facts</u>.

As set forth in the Procedural Background, the Court previously ruled that all the 49 "undisputed facts" set forth in the MSJ were "established for purposes of the trial" and "admitted into evidence."[29]  Accordingly, the Court identifies the following as the verbatim "Undisputed Facts" based on the MSJ:[30]

1.      Mr. Palecki is engaged in the business of construction, home remodel and improvements.

2.      In 2011, Mr. Palecki voluntarily filed for Chapter 7 Bankruptcy protection.

3.      On October 14, 2012, following his discharge in Bankruptcy, Mr. Palecki incorporated CCI.

4.      The McNultys own a carriage house adjacent to their primary residence located at 153 West 1st Avenue, Denver, Colorado 80223, the property that is the subject of the State Court Action (the "Property").

5.      In September 2022, the McNultys were searching for a General Contractor to oversee the construction and/or remodel of an Accessory Dwelling Unit ("ADU") on the Property (the "ADU Project").

6.      On or about September 12, 2022, the McNultys and CCI entered into a contract for the construction and/or remodel of an ADU on the Property (the "Contract").

7.      Pursuant to the Contract, the McNultys agreed to pay CCI $237,499.00 for the construction of the ADU with an estimated start date of November 2022 and with an estimated timeline of five to six months.

8.      On or about September 12, 2022, the McNultys provided CCI with a

---

[29]      Docket No. 44 at 1-2.
[30]      Some of the Undisputed Facts contain definitions used by the McNultys.  The Court quotes the Undisputed Facts verbatim, so they include such definitions.  In this Memorandum Opinion, the Court sometimes uses slightly different definitions of terms.  The Court's definitions govern to the extent of any discrepancies with the Undisputed Facts.

certified check in the amount of $59,375.00 — representing 25% of the total cost of the Project — pursuant to the Contract (the "Deposit").

9.     The Deposit was provided to CCI for the sole purpose of the McNultys' Contract.

10.     CCI deposited the Deposit provided by the McNultys in FirstBank Account x3154 in September 2022.

11.     On or about November 15, 2022, Mr. Palecki contacted Ms. McNulty requesting an additional financial installment under the Contract, even though virtually no work had been performed by that time and no permit had been obtained.

12.     Ms. McNulty refused the request because no milestones were reached under the Contract and because of the amount of the Deposit paid to date.

13.     In Fall 2022 into early 2023, Mr. Palecki obtained numerous loans on behalf of CCI from third parties to help keep CCI afloat financially.

14.     Due to significant delays arising out of CCI's failure to secure the necessary permits for the ADU Project, CCI and the McNultys mutually agreed to terminate the Contract.

15.     On March 21, 2023, Mr. Palecki suggested terminating the Contract and agreed to prepare an accounting of expenses incurred by CCI within seven to ten days and further agreed to return the remaining balance in a timely fashion.

16.     The McNultys agreed the best path forward was to cancel the Contract.

17.     On April 3, 2023, Mr. Palecki provided the McNultys a breakdown of costs expenses allegedly incurred by CCI, wherein Mr. Palecki proposed returning to the McNultys $37,737.56 of the Deposit.

18.     However, Mr. Palecki included a $12,000.00 "Retainer and Administrative Fees" even though there was no mention of a retainer in the Contract.

19.     Mr. Palecki's breakdown did not account for approximately $8,700 for which the McNultys requested backup documentation.

20.     On or about April 11, 2023, Mr. Palecki agreed to provide additional documentation the following week.

21.     Once again, however, Mr. Palecki failed to provide the additional documentation as promised.

22.     In response to the McNultys' repeated requests, Mr. Palecki promised to provide documentation on April 22, 2023 and again on April 26, 2023, but Mr. Palecki never provided the requested documentation as promised.

23.     Rather, Mr. Palecki changed his position regarding the parties' mutual agreement to terminate the Contract and claimed for the first time that the McNultys had defaulted under the Contract and were entitled to the return of only $11,875.00 of the Deposit.

24.     CCI never provided a notice of default as required under the Contract nor provided an opportunity to cure the alleged default.

25.     Mr. Palecki's May 12, 2023, email is an effort to manufacture a default under the Contract in order to avoid returning the Deposit.

26.     On May 22, 2023, Mr. Palecki subsequently backtracked yet again and agreed to return only $25,000 of the Deposit.

27.     At no time did Mr. Palecki or CCI ever indicate that they were entitled to retain the entire Deposit of $59,375.

28.     On September 1, 2023, as a result of CCI's breach, the McNultys filed a civil action against Mr. Palecki and CCI styled *Dawn McNulty and Jacob McNulty v. Christopher Robert Palecki et al.*, Case Number 2023CV32548, District Court, City and County of Denver, Colorado (the "State Court Action").

29.     In the State Court Action, the McNultys asserted claims against Mr. Palecki and CCI arising out of Mr. Palecki and CCI's misappropriation of the McNultys' Deposit, including: Fraudulent Misrepresentation/Inducement; Fraudulent Concealment; Breach of Contract; Unjust Enrichment/Constructive Trust; Accounting; and Negligent Misrepresentation.

30.     On November 16, 2023, the State Court issued an Order of Default Judgment against CCI in favor of the McNultys in the amount of $65,149.42, inclusive of pre-judgment interest and costs, which consists of the following amounts under Colorado statutory law:

   a.  Return of the Deposit in the amount of $59,375.00;

   b.  Prejudgment interest at the statutory rate (8% compounded annually) in the amount of $5,031.10 for September 16, 2022 through October 6, 2023);

   c.  Costs in the amount of $743.32 through October 1, 2023; and

   d.  Post-judgment interest as allowed by law.

9

31.    Mr. Palecki admitted that he is "responsible for the November 16, 2023 Order of Default Judgment."

32.    Mr. Palecki claims he is the sole owner and operator of CCI.

33.    Mr. Palecki has held approximately six accounts in his own name or his related entities as well as additional account(s) at FirstBank and the Bank of Colorado.

34.    A review of those bank account statements reveals that, over the past several years, Mr. Palecki has been using CCI assets to pay his personal obligations and the personal obligations of his family.

35.    For example, a review of CCI's FirstBank account ending in x3154 — the account into which Mr. Palecki deposited the McNultys' Deposit — reveals that Mr. Palecki paid numerous personal debts directly with assets of CCI:

| | | |
|---|---|---|
| a. | Payment of his ex-wife, Sara Palecki's, personal mortgage on the family residence located at 7100 Curtice Street from July 2022 to July 2023, at a time when Mr. Palecki was neither on the promissory note nor the title of the property. | $32,000.00 |
| b. | Payment of Mr. Palecki and/or Ms. Palecki's personal credit cards for which no corresponding backup has been provided to demonstrate a business-related purpose or reimbursement from the Paleckis to CCI. | $29,000.00 |
| c. | Payment of the Palecki family's car loans or leases from July 2022 to July 2023 — including Mr. Palecki's Ford F150, Ms. Palecki's Mercedes lease, as well as Mr. Palecki's son's car — as well as maintenance on those vehicles, even though none were titled in CCI's name and for which only the F150 appears on CCI's tax returns. | $29,000.00 |
| | In addition, this category includes a camper (valued at $44,252 on the depreciation of CCI's 2022 tax return), which is titled in the name of Ms. Palecki and which was given to Ms. Palecki as part of the parties' Separation Agreement in the Palecki divorce, which was finalized in October 2023. | |
| d. | Payment of numerous personal expenses of the Palecki family — including groceries, clothing, essential oils, hotels, college payments, kids' school trips, photographic/ head shots, etc. — for which no corresponding backup has | $24,000.00 |

10

been provided to demonstrate a business-related purpose or a subsequent reimbursement from the Paleckis to CCI.

|   |   |   |
|---|---|---|
| e. | Payment of home services and/or utilities — including lawn care, dog waste removal services, housekeeping services, Denver Water bills for the family residence, cell phone, Comcast, etc. — for which no corresponding backup has been provided to demonstrate a business-related purpose or a subsequent reimbursement from the Paleckis to CCI. | $10,000.00 |
| f. | Payment for vehicle maintenance of the vehicles identified above — including Mr. Palecki's Ford F150, Ms. Palecki's Mercedes lease, as well as Mr. Palecki's son's car — even though none were titled in CCI's name and for which only the F150 appears on CCI's tax returns. | $6,000.00 |

36.    Furthermore, the bank statements reveal numerous intercompany transfers between the various bank accounts.

37.    As noted above, Mr. Palecki and/or his family paid over $100,000 in personal expenses with CCI assets.

38.    During Mr. Palecki's 2004 Examination, he admitted that many of the entries above were personal in nature and not obligations of CCI.

39.    Additionally, Mr. Palecki often purchased business materials on his personal credit card.

40.    On May 19, 2023, Mr. Palecki withdrew $25,000 in cash from CCI's savings account, account number x0300.

41.    On June 20, 2023, Mr. Palecki withdrew $25,000 in cash from the CCI business account ending in x3451 [x3154].

42.    Sara Palecki and Chris Palecki filed for divorce on July 19, 2023 and a decree entered October 30, 2023.

43.    As part of the Separation Agreement, Sara Palecki was awarded many of the personal realty and belongings for which CCI's assets were used as payment, including: (1) the marital residence at 7100 South Curtice Street; (2) 2021 Mercedes; (3) 2017 Ford Focus; (4) 2020 Forest Vibe Camper; and (5) numerous personal credit cards.

44.    On July 17, 2023, [on] advice of counsel and only two days before his divorce, Mr. Palecki started a new construction business during his winddown of CCI and his imminent Bankruptcy.

45.    Mr. Palecki filed his Voluntary Petition for Chapter 13 Bankruptcy Protection on September 22, 2023, in which he listed the McNultys as well as the $59,375.00 Deposit as a debt subject to discharge.

46.    On November 7, 2023, the McNultys filed a Proof of Claim for the Deposit in the amount of $59,375.

47.    Mr. Palecki did not object to McNultys' Claim, proposed to pay 100% of the McNultys' Claim [through his Plan], and acknowledged responsibility for the debt.

48.    On July 17, 2024, following the State Court's entry of the Default Judgment and the McNultys' filing of their Amended Complaint, the McNultys filed an Amended Proof of Claim in the amount of $260,597.68, reflecting the full amount of the Default Judgment as well as treble damages pursuant to C.R.S. 18-4-405 and interest, as well as an undisclosed amount of attorney fees and costs (the full scope of which are unknown at this time).

49.    Mr. Palecki did not object to the Amended Proof of Claim.

## B.    Findings of Facts Based Upon Evidence at Trial.

The foregoing Undisputed Facts are extensive. However, during the trial, the McNultys and the Debtor introduced a wealth of additional proof as well as evidence duplicating or supporting some of the Undisputed Facts. At the risk of some duplication, but in the interests of completeness, the Court makes the following additional findings of fact based upon the evidence at trial.

### 1.    The Debtor and CCI.

The Debtor has been engaged in the construction industry for more than 25 years. He started out as a teenager helping his father installing windows and doors. Over time, he expanded his repertoire to construction of bathrooms, basements, kitchens, and residential additions. The Debtor operated through various corporate entities. In 2004, he incorporated Home Remodel and Design Group, Inc. for his business.[31] That company failed.[32] In 2012, the Debtor founded CCI (Christopher Construction, Inc.).[33] Between 2012 and 2023, the Debtor was the sole shareholder of CCI. He maintained exclusive control over the financial and other affairs of CCI. The Debtor used CCI to conduct his business of home remodeling and improvements. Importantly, neither the Debtor nor CCI has ever been licensed as a general contractor

---

[31]    Ex. 22-1.
[32]    Ex. 22-2.
[33]    Ex. 22-6

by the City and County of Denver, Colorado.  Put another way, they are not and never have been "licensed general contractors."[34]

### 2.    The McNultys.

The McNultys (Jason and Dawn McNulty) are husband and wife.  They are both college-educated professionals.  They own the Property, which is a historic residential property located in the Baker Historic Community.  The Property consists of a primary residence along with an unattached Carriage House.  The Carriage House was originally designed to protect a horse-drawn carriage (and perhaps some horses).  After purchasing the Property, the McNultys renovated the primary residence, which was a complex, time-consuming, and expensive task.

### 3.    The Carriage House Project.

The McNultys initially contemplated starting renovation of the Carriage House (the Carriage House Project) at the same time as the renovation of the primary residence — around 2017.  Toward that end, the McNultys commissioned and obtained architectural plans for the Carriage House Project in 2017 from their architect (EV Studios).[35]  They envisioned that the renovated Carriage House could serve as an automobile garage (on the ground level) as well as an ADU on the upper level.  The McNultys aimed to preserve the historic nature of the Carriage House.  In 2017 or 2018, they initiated two applications to the City and County of Denver Community Planning and Development Office (the "City Planning Office") pertaining to the Carriage House Project: a zoning review; and a Building Code review.[36]  After the zoning review, the McNultys obtained a zoning variance to proceed with the Carriage House Project.[37] (The zoning variance expired sometime before March 1, 2023.)[38]  As part of the Building Code review, the City Planning Office provided comments on the McNultys' architectural drawings around late 2017 or early 2018.[39]  However, the McNultys did not respond to the comments from the City Planning Office in 2018 so the Building Code application was effectively closed.  Instead, given time and financial constraints, they focused on the remodel of the primary residence at the Property.

### 4.    Initial Contact Between the Debtor and the McNultys.

A few years later, in 2020, the McNultys began to consider moving forward with the Carriage House Project again.  Around that time, the McNultys' neighbor, Marieka Buhlman, was in the midst of renovating the interior and building an addition to her home located at 147 West 1st Avenue, Denver, Colorado.  Ms. Buhlman hired the Debtor and CCI as her general contractor for the project.  During the construction work,

---

[34]    Tr. I at 23.
[35]    Ex. C.
[36]    Ex. 118.
[37]    *Id.*
[38]    *Id.*
[39]    *Id.*; and Ex. C.

in the fall of 2020, Marieka Buhlman introduced the Debtor to the Mrs. McNulty who she knew was interested in going forward with the Carriage House Project. Marieka Buhlman told Mrs. McNulty that the Debtor (or CCI) was a licensed general contractor. Ms. Buhlman also advised Mrs. McNulty that she was pleased with the work of the Debtor and CCI and effectively recommended them to the McNultys.

The Debtor met with Mrs. McNulty about the Carriage House Project in the fall of 2020. Mrs. McNulty showed the Debtor the architectural plans for the Carriage House Project but did not advise of prior permitting efforts with the City Planning Office. Per Mrs. McNulty's testimony at the trial, Mrs. McNulty vetted the Debtor by asking about his credentials. She specifically asked whether the Debtor was "licensed, bonded, and insured." The Debtor responded: "Yes."[40] Mrs. McNulty also asked whether the Debtor had experience with historic projects. Again, the Debtor responded: "Yes."[41] The Debtor also shared his references in addition to Ms. Buhlman. The McNultys followed up gathering more information from Mrs. Buhlman. And Ms. McNulty "talked to all of [the Debtor's] references."[42] Mrs. McNulty asked that the Debtor and CCI submit a bid for the Carriage House Project. Although they presented a construction bid in November 2020, the McNultys elected not to proceed at that time because of financial constraints. So, the Carriage House Project lingered a bit longer.

### 5. Renewed Contacts Between the Debtor and the McNultys before the Contract.

Around August 2022, the Debtor and the McNultys renewed their contacts concerning the Carriage House Project. The Debtor testified:

> Q. But you were aware that the McNultys sought a general contractor licensed in the City and County of Denver who could perform the work necessary to complete the ADU project, correct?

---

[40]   Tr. I. at 142. The Debtor did not expressly deny the "licensed, bonded, and insured" testimony of Mrs. McNulty. But, he indicated that he told Mrs. McNulty that he used "a third party to pull my permits." Tr. I at 30. Further, the Debtor testified about the meeting:

> Q. Now, you also represented to the McNultys that you could pull the permits, correct?
>
> A. Yes.
>
> Q. But in fact, you couldn't pull the permits, correct?
>
> A. Correct.

Tr. I. at 30. Based on the foregoing, and after considering the credibility of Mrs. McNulty and the Debtor, the Court accepts Mrs. McNulty's testimony that the Debtor represented that he was "licensed, bonded, and insured."

[41]   Tr. I at 142.

[42]   Tr. I at 178.

14

>    A.    Correct.
>
>    Q.    And the McNultys' project required a permit, correct?
>
>    A.    Correct.
>
>    Q.    Because you were not a general contract in the City and County of Denver, could you have pulled a permit?
>
>    A.    No.
>
>    Q.    Could any of the employees of Christopher Construction, Inc. pulled the permit?
>
>    A.    No.[43]

On September 1 or 2, 2022, the Debtor visited the McNultys in person at the Property to discuss the Carriage House Project.  There are two versions of what happened during the meeting.  With respect to licensing, the Debtor testified:

>    Q.    And you represented yourself as a contractor licensed in the City and County of Denver, correct?
>
>    A.    I represented myself as a contractor.[44]

Later, the Debtor swore:  "I told them [the McNultys] that I was a general contractor."[45] So, even acknowledging that he knew that the McNultys wanted a *licensed* general contractor, the Debtor tried to draw a fine distinction in his testimony between a "licensed general contractor" and "general contractor."  The Debtor explained that: "[y]ou don't have to be a general contractor with a license to be a general contractor."[46]

The McNultys testified to a different version of what happened at the initial 2022 meeting with the Debtor.  Mr. McNulty swore as follows:

>    Q.    And tell me about that meeting you had.
>
>    A.    Mr. Palecki came to our house to just talk through some of the components of what we were looking for, and then also provide me an opportunity to ask him some questions . . .  I inquired as to . . . his license, if he's licensed

---

43   Tr. I at 24.
44   Tr. I at 29.
45   Tr. I at 30.
46   Tr. I at 31-32.

and bonded, et cetera, questions like that.

Q. Did you ask Mr. Palecki anything else, such as his ability to pull permits?

A. Yes, I did a full scope that I would consider necessary for a full project like this.  So his ability to pull permits, his ability to interact on our behalf with the City, if he was a licensed general contractor, if he was licensed and bonded and . . . the full scope of what we would need as a general contractor that would be licensed in the City and County of Denver, to be able to manage a project such as this.
. . . .

He indicated, yes, he was a licensed general contractor, he was licensed and bonded, he could represent our interests directly with the City, and that he could pull all the necessary permits in order to push the project forward and complete the project.[47]

Mrs. McNulty testified to something very similar:

Q. [At the September 1 or 2, 2022 meeting] did he [the Debtor] discuss his credentials during that meeting?

A. Yes.

Q. And did he identify that he was a general contractor?

A. Yes.

Q. Licensed and bonded?

A. Yes.  Very specifically.  My husband drilled him on that.[48]

Given the direct conflict in the testimony as between the Debtor and the McNultys, the Court has carefully considered the demeanor, candor, and credibility of the witnesses as well as corroborating evidence.  The Court finds that the Debtor expressly represented to the McNultys at the initial 2022 meeting that he was a licensed, bonded, and insured general contractor.  The Court bases this finding upon

---

[47]     Tr. I at 184-86.
[48]     Tr. I at 143.

16

the much greater credibility, detail, and consistency of the McNultys' testimony.  Having recently completed the renovation of their residence, the McNultys knew that they needed a licensed general contractor for the Carriage House Project.  Mr. McNulty took the lead at the meeting in pressing the Debtor to make sure he was a licensed general contractor.  The Court also finds that the McNultys both testified convincingly that they would not have moved forward with the Debtor if they had known that he was not a licensed general contractor.  The McNultys also conducted additional diligence by communicating with their neighbor, Mrs. Buhlman, and all the references provided by the Debtor concerning the Debtor's qualifications.  (However, the McNultys did not check the records of the City and County of Denver regarding whether the Debtor was a licensed general contractor.)  The Court considers the Debtor's contrary testimony as not credible and even contradictory.  For example, the Debtor admitted that he was "aware that the McNultys sought a general contractor licensed in the City and County of Denver who could perform the work . . . ."  But, the Debtor would only have known what the McNultys wanted if the McNultys had asked whether the Debtor was a licensed general contractor.  Accordingly, the Debtor expressly misrepresented himself from the get-go.

In any event, after the September 1 or 2, 2022 meeting at the Property, the McNultys and the Debtor decided to move forward on the Carriage House Project.  The McNultys provided the Debtor with an updated architectural plan from EV Studio but did not advise of prior permitting efforts with the City Planning Office.  The Debtor submitted an estimate and draft contract.[49]  The Debtor and the McNultys had some other meetings and communications.[50]  Notably on September 11, 2022, the Debtor sent the McNultys an e-mail thanking them "for selecting me as your general contractor."[51]

### 6.    The Contract and Deposit.

On September 12, 2022, the McNultys and CCI entered into a "Contract" for the Carriage House Project (the "Contract").[52]  The Debtor drafted the Contract.  The Contract consists of three main parts: (1) a scope of work specific to the Carriage House Project; (2) a payment schedule (referenced as Exhibit A); and (3) general contract terms.

The scope of work part of the Contract identifies 24 discrete work components along with pricing.  Thereafter, the Contract provides:

|  |  |
|---|---|
| Total: | $237,499.00 |
| Start Date: | November 2022 |
| Estimated Timeline: | 5-6 months. |

---

[49]    Ex. 1.

[50]    Ex. 1-3.

[51]    Ex. 3.

[52]    Ex. 4.  The form of the Contract admitted into evidence was signed by the Debtor but not signed by the McNultys.  However, the Debtor and the McNultys testified that the McNultys signed the Contract; and Undisputed Fact No. 6 states that "the McNultys and CCI entered into" the Contract.  So, the Court accepts that the McNultys signed the Contract.

The payment schedule part of the Contract states: "On signing $59,375.00 Paid." Then, the Contract lists the various contemplated work components and progress payments. In other words, the Contract contemplates periodic payments by the McNultys as work is started or completed on various tasks.

Finally, the general terms part of the Contract identifies the "Contract Price" as $237,499.00 and includes eleven sections. Relevant to the dispute between the Debtor and the McNultys, Section 10 of the Contract states:

> Contractor agrees to perform the Work as an independent contractor and not as the agent, employee, or servant of Owner. Contractor has and hereby retains the right to exercise full control and supervision of the Work and full control over the employment, direction, method of performing, compensation, and discharge of all persons assisting in the Work. Contractor agrees to be responsible for its own acts and those of its subordinates, employees, and subcontractors during this Agreement.[53]

Per the Contract, the McNultys paid the Deposit ($59,375.00) to CCI on September 12, 2022, which amount represented approximately twenty-five percent (25%) of the full Contract price.[54] The Deposit was provided to CCI for the sole purpose of the Contract and not to be used for any other purpose. The Debtor knew that the Deposit had been entrusted to him to be used only for the Carriage House Project. He testified:

> Q.    That deposit [$59,375.00] was provided to CCI for the sole purpose of the McNultys' contract, correct?
>
> A.    Correct.
>
> Q.    Did you think that you were entitled to use that money to pay for your personal expenses?
>
> A.    No.
>
> Q.    To pay for your mortgage?
>
> A.    No.
>
> Q.    To pay your wife's Mercedes?
>
> A.    No

---

[53]    Ex. 4 at 7.
[54]    Undisputed Fact Nos. 8 and 10; Ex. 25 at 20.

18

> Q.      That money was meant to be used solely for the
>          McNultys' project, correct?
>
> A.      Correct.
>
> Q.      . . . that deposit was refundable?
>
> A.      Yes.[55]

The McNultys also testified that "the sole purpose" of the Deposit was for use on the Carriage House Project and neither CCI nor the Debtor were authorized to spend the Deposit for other projects or expenses.[56]

When CCI received the Deposit, CCI was in serious financial straits. CCI (acting at the direction of the Debtor) spent the entire Deposit within the first month (i.e., by October 12, 2022) before any actual construction work had been performed. The Debtor repeatedly acknowledged as much. For example, the Debtor testified:

> Q.      You testified that . . . within the first month, you spent
>          the deposit on other projects, correct?
>
> A.      Yes . . .[57]

None of the Deposit was used on the Carriage House Project. The Debtor testified:

> Q.      But you did not spend that money [the Deposit] on the
>          McNultys' project, correct?
>
> A.      Correct. I had other projects going on . . . .[58]

CCI (at the direction of the Debtor) spent the Deposit, which was in CCI's general operating account, for general operating expenses, other projects, and payments of personal expenses for the Debtor and his spouse.[59] For example, bank statements (of CCI and the Debtor) for the period from September 12, 2022 to October 12, 2022 (*i.e.*, the one-month period after the McNultys made the Deposit) show that the Debtor caused material transfers from the CCI operating account at First Bank (Account No. XXX-XX-3154) to the Debtor's personal bank account at First Bank (Account No. XXX-XX-8644). Once in the Debtor's personal account, the transferred funds were spent on

---

[55]     Tr. I at 43-44.
[56]     Tr. I at 145-46.
[57]     Tr. II at 22-23. *See also* Tr. I at 51 (Debtor acknowledged that he and CCI spent entire Deposit before October 20, 2022).
[58]     Tr. I at 47.
[59]     Ex. 25 (bank statements for CCI operating account); Ex. 28 (bank statements for Debtor's personal account).

personal expenditures such as restaurants, groceries, entertainment, health care, gasoline, and pet supplies.[60]  Meanwhile, the bulk of the Deposit was spent by the Debtor between September 12, 2022 and October 12, 2022 at the CCI level paying for materials, supplies, restaurants, gasoline, entertainment, clothing, groceries, and photography unrelated to the Carriage House Project.[61]  For example, the Debtor caused CCI to spend, among other things: (1) $5,941.00 for steel not used on the Carriage House Project; (2) $8,250.00 for custom stone not used on the Carriage House Project; (3) $2,500.00 for mechanical work not related to the Carriage House Project; (4) $7,462.00 for plumbing not installed at the Carriage House Project; (5) $3,569.00 for electrical work not performed on the Carriage House Project; (6) $350.00 for recreational vehicle or boat storage unrelated to the Carriage House Project; (7) $1,527.28 for flooring not installed on the Carriage House Project; (8) $1,275.79 on custom photography not for the Carriage House Project; and (9) more than $15,400.00 in materials purchased from Home Depot, Loews, a lumber yard, and flooring vendor none of which were used on the Carriage House Project.[62]  The Debtor also caused CCI to pay individuals (likely employees or subcontractors such as Ruben Cabellero, Marco Pineda, Ismael Sotelo Garcia, Jonathan Ruans, Chris Elder, Jorge Mijares, and Nathan Padilla-Martinez) at least $29,912.00 during the period even though they did not work on the Carriage House Project.[63]  Although the Deposit was not in a segregated account and instead was placed in the CCI operating account on September 12, 2022, again, the Debtor confirmed that the entire Deposit was expended within one month (*i.e.* October 12, 2022).[64]  Importantly, the Debtor never disclosed to the McNultys that the Debtor spent the Deposit for expenses other than the Carriage House Project and in fact, repeatedly mislead the McNultys into believing that the Deposit was unspent (when the Debtor offered to make various partial refunds).[65]

The Debtor improperly spent the Deposit "to keep the company [CCI] moving forward, to finish other projects, to collect funds.  And then again later taking out MCA loans [merchant cash advance loans] to reimburse for those funds [the Deposit]."[66]  In other words, the Debtor took the Deposit and spent it but hoped to be able to turn things around with CCI so that CCI could replenish the Deposit later and use it for the Carriage House Project.  But, that never happened.  Neither CCI nor the Debtor ever returned a penny of the Deposit to the McNultys.

### 7. The Carriage House Project and Termination of the Contract.

---

[60]   Ex. 28 at 16-24.
[61]   Ex. 25 at 17-24.
[62]   *Id.* at 186-204.
[63]   *Id.*
[64]   The balance in CCI's operating account quickly was reduced far below the Deposit.  For example, on October 31, 2022, CCI's operating account had a balance of only $16,530.06. Ex. 25 at 22.  The ending balances for November and December 2022 and January, February, March, April, and May 2023 were, respectively: $17,843.76; $29,807.54; $14,774.19; $18,893.32; $33,801.34; $31,633.28; and $13,899.36. Ex. 25.  In June 30, 2023, the CCI operating account balance zeroed out.  *Id.* So, CCI never was in a position to repay the full Deposit or use the Deposit for the Carriage House Project.
[65]   Tr. I at 47.
[66]   Tr. I at 48.

Since neither the Debtor nor CCI was actually a licensed general contractor capable of performing the Contract, in September 2022, the Debtor engaged Matt Seiler as a licensed general contractor.  Put another way, the Debtor (who had held himself out as a licensed general contractor) hired another general contractor; but he concealed the hire from the McNultys.  The McNultys did not learn about Mr. Seiler's role until approximately January 25, 2023.[67]  Meanwhile, the McNultys provided engineering and architectural plans for the Carriage House Project.[68]

In any event, the Carriage House Project was never completed.  The Debtor (presumably through Mr. Seiler) filed an application for a building permit on October 28, 2022.[69]  The Debtor and the McNultys blame each other for the delays and collapse of the Carriage House Project.  The Debtor testified that the Carriage House Project was delayed because the McNultys failed to provide all necessary plans and documentation so that Mr. Seiler could successfully obtain a building permit.[70]  (However, the only documentary evidence admitted on the topic at trial showed that the Debtor requested additional documentation from the McNultys many months after the Contract — on January 25, 2023.)[71]  The Debtor also notes that the McNultys' zoning variance expired sometime in late 2022 or early 2023.  Meanwhile, the McNultys attribute fault to the Debtor since the Debtor was not a licensed general contractor.  The McNultys also testified that they provided all required documentation to the Debtor who was not diligent in obtaining a building permit.[72]  The Court finds it is enough to say that "due to significant delays arising out of CCI's failure to secure the necessary permits for [the Carriage House Project], CCI and the McNultys mutually agreed to terminate the Contract."[73]  The Debtor and the McNultys agreed to terminate the contract on or about March 21, 2023.[74]

When they agreed to terminate the Contract, the Debtor promised that "an accounting of expenses incurred by my company will be prepared within the next 7-10 days.  The remaining balance [of the Deposit] will then be returned to you in a timely fashion."[75]  After the deadline, the Debtor provided "a breakdown of costs and expenses . . . per the terms of the contract."[76]  The Debtor asserted expenses of $21,262.44, none of which were supported by documentation.[77]  Further, the majority of the purported

---

[67]   Ex. 117-2

[68]   Ex. 117-1.

[69]   Ex. B.

[70]   Tr. I at 101-06 and 112.

[71]   Ex. 117-2

[72]   Tr. I at 147-49

[73]   Undisputed Fact No. 14.

[74]   Ex. 6.  The Debtor wrote:  "At this time, I am concerned whether the project can be completed per the contract, due to the delays associated with the permitting process and the resulting breakdown in communications . . . .  As you indicated your desire to terminate the contract, I feel this may be the best option for both parties."  *Id*.  Mr. McNulty responded, "we are now aligned that the best path forward for all parties is to cancel the contract."  *Id*.

[75]   *Id*.

[76]   Ex. 7.

[77]   *Id*.

21

expenses were for "retainer and administrative fees," a category of expenses not contemplated in the Contract.  The Debtor proposed to return $37,737.56 of the Deposit to the McNultys.[78]  However, CCI did not have enough funds to pay the McNultys such amount at that time.[79]  In any event, the McNultys repeatedly asked for documentation supporting the purported expenses.[80]  The Debtor did not provide any supporting documentation for such expenses despite promising to do so several times.[81]  The Debtor also did not refund the undisputed amount of $37,737.45 either.  Instead, a few months later, the Debtor asserted that the McNultys breached the Contract and so offered to return only $11,875.00 of the Deposit.[82]  Ten days later, the Debtor proposed to send the McNultys $25,000.00 (which CCI had no ability to pay).[83]  Ultimately, despite his various representations, the Debtor never refunded anything at all on the Deposit.

### 8.   The State Court Lawsuit.

On September 1, 2023, the McNultys commenced a lawsuit against the Debtor and CCI captioned: *Dawn McNulty and Jacob McNulty v. Christopher Robert Palecki and Christopher Construction, Inc.*, Case No. 2023-CV-32548 (District Court, City and County of Denver, Colorado) (the "State Court Action").[84]  In the State Court Action, the McNultys asserted claims against the Debtor and CCI including fraudulent misrepresentation/inducement, fraudulent concealment, breach of contract, unjust enrichment/constructive trust, accounting, and negligent misrepresentation.[85]  The Debtor's September 22, 2023 bankruptcy Petition stayed the State Court Action as against the Debtor, but not against CCI.  The District Court for the City and County of Denver subsequently entered a Default Judgment in favor of the McNultys and against CCI in the amount of $65,149.42 (the "Default Judgment").[86]  The Debtor has confessed that he is responsible personally for the amount of the Default Judgment.[87]

### 9.   Damages.

The Court previously determined that the Debtor is liable to the McNultys in the amount of $65,419.52 (not including potential treble damages and attorneys' fees and costs).[88]  At trial, the Debtor established that CCI or the Debtor paid: the City Planning Office $665.00 on October 28, 2022 as part of the application for a building permit for the Carriage House Project;[89]  Techno Metal Post Pikes Peak Region $2,325.00 on

---

[78]     *Id.*
[79]     Ex. 25; Tr. I at 66 and 71.
[80]     Ex. 8 and 9.
[81]     Tr. I at 78.
[82]     Ex. 9.  In Undisputed Fact No. 25, the Debtor admitted he alleged a breach of contract in an effort "to avoid returning the Deposit."
[83]     Ex. 10; Tr. I at 75.
[84]     Undisputed Fact No. 28.
[85]     Undisputed Fact No. 29.
[86]     Undisputed Fact No. 30; Ex. 12.
[87]     Undisputed Fact No. 31.
[88]     Docket Nos. 43 and 44; Tr. I at 20-21.
[89]     Ex. B.

March 21, 2023 for engineering for helical piers on the Carriage House Project;[90] and $1,800.00 for cabinets for the Carriage House Project.[91]  In addition, the McNultys received approximately $1,500.00 under the Debtor's confirmed Plan.[92]

## V.    Legal Analysis and Conclusions.

### A.    General Legal Framework.

In the Amended Complaint, the McNultys asserted six claims for nondischargeability against the Debtor.  Later, during Closing Argument, counsel for the McNultys confirmed that the McNultys elected not to pursue the Fourth Claim for Relief "Exception to Discharge for Fraud or Defalcation While Acting in a Fiduciary Capacity." With respect to the remaining causes of action, the Court found that the way the McNultys presented their causes of action in the Amended Complaint was both confusing and convoluted.

The headings of the First Claim for Relief, Second Claim for Relief, and Third Claim for Relief all bear the same title: "Exception to Discharge for Money Obtained by False Pretenses, a False Representations or Actual Fraud" and expressly refer to "11 U.S.C. § 523(a)(2)."  However, the title of the Third Claim for Relief refers to "Conversion/Civil Theft, C.R.S. § 18-4-405" and "11 U.S.C. §§ 523(a)(4) and (a)(6)" too. The Court does not understand why the McNultys asserted three causes of action under the same statute: Section 523(a)(2)(A).  However, based on a fair reading of the Amended Complaint, the Court infers that the McNultys are contending that the Debtor's debt to the McNultys should not be dischargeable based on all of the three discrete subparts of Section 523(a)(2)(A) — false pretenses, false representations, and actual fraud.  Accordingly, the Court will analyze such Section 523(a)(2)(A) issues together irrespective of multiple duplicative causes of action.

With respect to the Third Claim for Relief, the McNultys also included references to "Conversion/Civil Theft, C.R.S. § 18-4-405" and "11 U.S.C. §§ 523(a)(4) and (a)(6)." The Court finds such pleading puzzling and duplicative.  The Fifth Claim for Relief already is framed as "Exception to Discharge for Embezzlement — 11 U.S.C. § 523(a)(4)."  The Sixth Claim for Relief already covers "Exception to Discharge for Willful and Malicious Injury — 11 U.S.C. § 523(a)(6)."  Thus, the Court does not understand why the McNultys are asserting nondischargeability under Section 523(a)(4) twice: in both the Third Claim for Relief and the Fifth Claim for Relief.  Similarly, the Court cannot fathom why the McNultys wish to assert nondischargeability under Section 523(a)(6) twice: in both the Third and the Sixth Claims for Relief.  Accordingly, the Court will analyze the Section 523(a)(4) issues together irrespective of the duplication.  Similarly, the Court will consider the Section 523(a)(6) issues together despite the duplication.

---

[90]    Ex. D.
[91]    Tr. II at 50.
[92]    Tr. I at 195.

That leaves a final confusion.  The McNultys jammed "Conversion/Civil Theft, C.R.S. § 18-4-405" into the Third Claim for Relief.  The McNultys appear to rely on statutory "civil theft" mainly (or maybe exclusively) as a basis for possible treble damages as well as attorneys' fees and costs.  However, during closing argument, counsel for the McNultys conceded that treble damages for civil theft would not apply to the Section 523(a)(2)(A) claims.[93]  Instead, the McNultys assert treble damages for civil theft only with respect to the Section 523(a)(4) and Section 523(a)(6) claims.[94]  Given the foregoing, the Court will consider civil theft under COLO. REV. STAT. § 18-4-405 effectively as a damage enhancement on the Section 523(a)(4) and Section 523(a)(6) claims to be analyzed later in this Opinion after all the other nondischargeability claims. *DRCK, LLC v. Chong (In re Chong)*, 523 B.R. 236, 250-53 (Bankr. D. Colo. 2014) (considering civil theft claim as part of damages after other nondischargeability claims).

So, having identified what is at issue, the Court starts its legal analysis with an overview of the relevant statutes, burden of proof, and general nondischargeability standards before addressing the following topics in the following sequence: (1) existence of debt; (2) Section 523(a)(2)(A) claims; (3) Section 523(a)(4) claims; (4) Section 523(a)(6) claims; and (5) additional damages (civil theft) and interest.

### 1.    Statutory Text.

The bankruptcy statutes relied upon by the McNultys in the Amended Complaint (Sections 523(a)(2)(A), (a)(4), and (a)(6)), provide:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt — . . . .
>
> (2)    for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —
>
>   (A)    false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; . . . .
>
> (4)    for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . . .
>
> (6)    for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).

---

[93]    Tr. II at 55.
[94]    Tr. II at 75.

### 2.   **Burden of Proof.**

The McNultys bear the burden of establishing nondischargeability of a particular debt under Section 523(a) by a preponderance of the evidence.  *Grogan*, 498 U.S. at 286-87 ("Requiring the creditor to establish by a preponderance of the evidence that his claim is not dischargeable reflects a fair balance between these conflicting interests."); *Houston v. Munoz (In re Munoz)*, 536 B.R. 879, 884 (Bankr. D. Colo. 2015) (requiring creditor to prove Section 523(a) claims by a preponderance of the evidence). Additionally, exceptions to discharge under Section 523(a) "are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor."  *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997).  *See also Sawaged v. Sawaged (In re Sawaged)*, 2011 WL 880464, at *3 (Bankr. D. Colo., Mar. 15, 2011) (same).

### 3.   **Nondischargeability Standard.**

All Section 523(a) nondischargeability claims require a two-part analysis.  First, "the bankruptcy court must determine the validity of the debt under applicable law." *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8 (10th Cir. BAP 2016); *see also Lang v. Lang (In re Lang)*, 293 B.R. 501, 513 (10th Cir. BAP 2003) (if the alleged debt is for fraud, "state law of fraud controls with respect to whether fraud has occurred").  This is referred to as the "claim on the debt" component.  *Thompson*, 555 B.R. at 8.  Second, if there is a valid debt, "the bankruptcy court must determine the dischargeability of that debt under Section 523."  *Id.*; *see also Lang*, 293 B.R. at 513 ("bankruptcy law controls with respect to the determination of nondischargeability").  This is referred to as the "dischargeability" component.  *Thompson*, 555 B.R. at 8.  There may be substantial overlap between the "claim on the debt" and the "dischargeability" components, especially with respect to allegations of fraud and misrepresentation.

## B.   **The McNultys Established the Validity of a Debt Owed by the Debtor.**

As set forth in *Thompson*, 555 B.R. at 8, the first part of the nondischargeability exercise is to determine whether the bankruptcy debtor owes the creditor a valid debt. In this case, the exercise is abbreviated because, the Debtor already agreed and the Court already found that the Debtor is indebted to the McNultys in the amount of $65,419.52 exclusive of potential treble damages, attorneys' fees, and costs (which amount matches the Default Judgment entered in the State Court Action against CCI).[95]

However, during the trial, the McNultys conceded certain deductions based on payments of expenses by the Debtor and payments to the McNultys under the Plan. More specifically, the McNultys agreed:  (1) that $1,500.00 should be deducted to account for distributions that the McNultys already have received under the Plan;[96] (2) $665.00 should be deducted based on the amount that CCI or the Debtor paid on October 28, 2022 to the City Planning Office for the building permit application for the

---

[95]       Docket Nos. 43 and 44.
[96]       Tr. II at 49.

Carriage House Project;[97] (3) $1,800.00 should be deducted for cabinets paid for by CCI or the Debtor;[98] and (4) $2,325.00 should be deducted based on the amount that CCI or the Debtor paid to Techno Metal Post Pikes Peak Region on March 21, 2023 for engineering the helical piers on the Carriage House Project.[99]

Accordingly, the valid base debt owed by the Debtor to the McNultys is: $59,129.52 (calculated as $65,419.52 – ($1,500.00 + $665.00 + $1,800.00 + $2,325.00) = $59,129.52). Such amount is exclusive of potential treble damages and attorneys' fees and costs which may be awardable for civil theft.

**C.**     **The McNultys Met Their Burden to Prove Nondischargeability under Section 523(a)(2)(A).**

The McNultys assert nondischargeability of the Debtor's debt under Section 523(a)(2)(A). Section 523(a)(2)(A) contains three subparts: (1) false pretenses; (2) false representation; or (3) actual fraud. The Court construes the Amended Complaint as asserting all three variants of Section 523(a)(2)(A) nondischargeability. "While the elements for each theory [subpart] under Section 523(a)(2)(A) differ, the common thread is a debtor's intent to defraud a creditor." *Chong*, 523 B.R. at 244.

**1.**     **False Representations.**

To establish nondischargeability on grounds of misrepresentation pursuant to Section 523(a)(2)(A), the McNultys must prove the following elements by a preponderance of the evidence:

> (1) the debtor made a false representation; (2) the debtor made the representation with the intent to deceive the creditor; (3) the creditor relied on the false representation; (4) the creditor's reliance was [justifiable][100]; and (5) the false representation resulted in damages to the creditor.

*Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996); *see also Field v. Mans*, 516 U.S. 59, 74-75 (1995); *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2009). Further, the false representation must be "other than a statement respecting the debtor's or an insider's financial condition."

The McNultys have asserted four misrepresentations: (1) the Debtor told the McNultys that he was a licensed general contractor (but he was not a licensed general contractor); (2) the Debtor told the McNultys that he was capable of performing the work

---

[97]     Tr. II at 50.
[98]     *Id.*
[99]     Tr. II at 51. The foregoing payments were made after the Deposit was misappropriated.
[100]    In *Young*, 91 F.3d at 1373, the Tenth Circuit states that the reliance must be "reasonable." However, that does not mean "'reasonableness' in the sense of whether an objectively reasonable person would have relied upon the debtor's representation." *Riebesell*, 586 F.3d at 791. Instead, under *Field*, 516 U.S. at 74-75, the reliance must be "justifiable."

on the Carriage House Project (but he was not capable of performing the work); (3) the Debtor told the McNultys that he was able to pull all required building permits (but he was not able to pull any building permits); and (4) the Debtor told the McNultys that he could represent the McNultys' interests in the building permit process (but he could not represent their interests since he was not a licensed general contractor).[101]

Regarding the first Section 523(a)(2)(A) element, the Court finds that the Debtor made several false representations.  Specifically, the Debtor told the McNultys that he was a "licensed general contractor."  He did so on at least two occasions: at a meeting with Mrs. McNulty during the fall of 2020; and again during a meeting with the McNultys on September 1 or 2, 2022.  The Court recognizes that the Debtor has denied making such statements.  However, as set forth in the Court's Findings of Fact, the Court carefully considered the demeanor, candor, and credibility of the witnesses as well as the overall context and corroborating evidence.  Again, the Court concludes that the Debtor repeatedly told the McNultys that he was a "licensed general contractor."  And, the evidence is clear that the Debtor was not a general contractor licensed by the City Planning Office when he made such misrepresentations.  The additional misrepresentations identified by the McNultys all flow from the core false representation that the Debtor was a licensed general contractor when he was not.  For example, the Court finds that the Debtor told the McNultys that: (a) he was capable of performing the work on the Carriage House Project; (b) he was able to pull all required building permits; and (c) he could represent the McNultys' interests in the building permit process.  But none of that was true because the Debtor himself was not a licensed general contractor. As a result he could not interface with the City Planning Office at all.

Considering the second Section 523(a)(2)(A) element, the Court determines that the Debtor made the foregoing misrepresentations with the intent to deceive the McNultys.  A creditor:

> . . . may prove intent to deceive through direct evidence or a court may infer intent from the totality of the circumstances. An intent to deceive does not mean that a debtor acted with a "malignant heart." Rather, "a statement need only be made with reckless disregard for the truth."

*Assoc. Mort. Corp. v. Weaver (In re Weaver)*, 579 B.R. 865, 891 (Bankr. D. Colo. 2018); *see also Chong*, 523 B.R. at 245 ("Intent to deceive can be inferred from the totality of the circumstances."); *Santiago v. Hernandez (In re Hernandez)*, 452 B.R. 709, 721 (Bankr. N.D. Ill. 2011) ("where the debtor knowingly and recklessly makes false representations that he knows or should know will induce another to act, the court can infer intent to deceive.").

The totality of the circumstances in this case demonstrates that the Debtor acted with an intent to deceive the McNultys.  From early on, the Debtor knew that the McNultys wanted to engage only a licensed general contractor for the Carriage House

---

[101]   Tr. II at 33-34.

Project.  The Debtor candidly admitted as much during his testimony.  He also knew that only a licensed general contractor could obtain a building permit from the City Planning Office.  Knowing the foregoing, the Debtor nevertheless told that McNultys a series of falsehoods: that he was a licensed general contractor who could deal with the City Planning Office and obtain the required building permits.  Likely the Debtor did not have a "malignant heart" when he made the misrepresentations.  Probably, he was just trying to secure business for CCI and himself constructing the Carriage House Project.  But, plainly, he made the false statements with reckless disregard for the truth.  He knew the statements were false.  Furthermore, at a bare minimum, the Debtor made material omissions (*i.e.,* concerning his qualifications and his intent to engage a second general contractor who was licensed) in dealing with the McNultys.  "The *scienter* requirement [under Section 523(a)(2)(A)] may be established by material omissions." *Chong*, 523 B.R. at 245.  So, the Debtor intended to deceive.

The third Section 523(a)(2)(A) element is reliance.  The Court assesses that the McNultys absolutely would not have entered into the Contract if they had known that the Debtor was not a licensed general contractor.  Both Mrs. McNulty and Mr. McNulty testified repeatedly, consistently, and credibly on the point.  No contrary evidence was presented.  All this is another way to say that the McNultys relied on the false representations of the Debtor.

Although the McNultys proved that they relied on the Debtor's misrepresentations in entering into the Contract, that is not enough.  Section 523(a)(2)(A) requires (as its fourth element) that the McNultys show that their reliance was justifiable.  In *Young*, 91 F.3d at 1373, the Tenth Circuit indicated that the reliance must be "reasonable."  However, the appellate courts later clarified that the reliance must be "justifiable." *Riebesell*, 586 F.3d at 791; *Field*, 516 U.S. at 74-75.  Reasonable reliance and justifiable reliance are slightly different.  Reasonable reliance is an objective standard based upon whether a reasonable person would have relied on the alleged false representations.  Justifiable reliance is a "less demanding [standard]" than reasonable reliance.  *Field*, 516 U.S. at 61; *see also Wagner v. Wagner (In re Wagner)*, 492 B.R. 43, 52 (Bankr. D. Colo. 2013) *aff'd*, 527 B.R. 416 (10th Cir. BAP 2015) ("Justifiable reliance is not a high standard."); Richard Levin & Henry J. Sommer, 4 COLLIER ON BANKRUPTCY ¶ 523.08[1][d] (Matthew Bender 16th ed. Supp. 2020) (justifiable reliance is "a less exacting standard" than reasonable reliance.  Instead of an objective standard, justifiable reliance is a subjective standard that focuses on the "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than [applying] a community standard of conduct to all cases."  *Riebesell,* 586 F.3d at 792; *see also Wharton v. Flanagan (In re Flanagan)*, 2014 WL 3932647, at *7 (Bankr. D. Colo. 2014) (noting difference between "reasonable reliance" and "justifiable reliance").  Justifiable reliance requires "the plaintiff must 'use his senses' and at least make 'a cursory examination or investigation' of the facts of the transaction before entering into it."  *Riebesell,* 586 F.3d at 792.  Put another way:

> In order for the Plaintiff to have justifiable reliance on a
> representation under 11 U.S.C. § 523(a)(2)(A), the Plaintiff

> need only perform a cursory inspection of the representation
> to the extent that it should be very obvious that the
> representation is fraudulent.  Justifiable reliance is not
> reasonable reliance . . . .  It is merely what a cursory
> examination of the representation would uncover.

*Adams Cnty. Dept. Social Servs. v. Sutherland-Minor (In re Sutherland-Minor)*, 345 B.R. 348, 354 n. 4 (Bankr. D. Colo. 2006); *see also Chong*, 523 B.R. at 245 (same).

During the trial, the Debtor attacked the Section 523(a)(2)(A) reliance element. In cross examination, Debtor's counsel established that the McNultys did not access the City Planning Office's internet website to check whether the Debtor actually was a licensed general contractor.  They also did not make direct inquiries to the City Planning Office (either in person, by telephone, or electronically).  Further, the McNultys did not demand a copy of the Debtor's purported general contractor license.  And, they did not insist on a representation of licensure in the Contract.  In retrospect, all of those might have been wise and maybe even reasonable steps to take given the importance of the Debtor being a licensed general contractor.  But, again, the standard is "justifiable reliance."  The Court finds that the McNultys made at least a "cursory examination or investigation" of the facts concerning the Debtors licensure and qualifications prior to entering into the Contract.  The Debtors repeatedly asked the Debtor whether he was a licensed general contractor in 2020 and 2022.  Mrs. McNulty did so separately and then the McNultys did so together.  The Debtor told them that he was a licensed general contractor.  The McNultys contacted their neighbor, Marieka Buhlman, who led them to believe that the Debtor was a licensed general contractor.  And, Mrs. McNulty contacted all of the Debtor's other references too.  The McNultys knew that only a licensed general contractor could obtain a building permit for construction in the City and County of Denver.  Since the Debtor engaged in construction activities in Denver, they justifiably assumed that the Debtor must have been licensed by the City Planning Office.  And, it was not "very obvious" under such circumstances that the Debtor's representation was false.  *Sutherland-Minor*, 345 B.R. at 354 n. 4.  The Court finds that the foregoing efforts were enough to meet the justifiable reliance hurdle.

The final Section 523(a)(2)(A) element is that the misrepresentations resulted in damages.  They did.  The McNultys would not have entered into the Contract without knowing that the Debtor was a licensed general contractor.  So, it was the Debtor's misrepresentations which secured the contractual arrangement.  Then, CCI demanded the Deposit ($59,375.00).  The McNultys paid the Deposit contemporaneously with entering into the Contract.  The Debtor caused CCI to misappropriate the entire Deposit within a month.  None of the Deposit was spent on the Carriage House Project.  So, the McNultys were damaged to the extent of the Deposit.  Later, the McNultys obtained the Default Judgment against CCI in a slightly larger amount: $65,419.52.  The Debtor conceded that he is liable to the McNultys in such amount.  However, the McNultys later agreed to a few deductions for certain expenses which the Debtor or CCI paid pertaining to the Carriage House Project and funds paid under the Plan.  Thus, the Section 523(a)(2)(A) damages are $59,129.52, exclusive of attorneys' fees and costs.

Based upon the foregoing, the McNultys have established all the requirements of Section 523(a)(2)(A) for the false representation component and are entitled to a nondischargeable judgment in their favor and against the Debtor for $59,129.52.  *See Hernandez*, 452 B.R. 709 (debtor held liable under Section 523(a)(2)(A) for falsely claiming that he had adequate building license when he did not).

**2.**     **False Pretenses.**

The McNultys also seek to establish nondischargeability on grounds of false pretenses pursuant to Section 523(a)(2)(A).  The statutory phrase "false pretenses" is defined as "any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor." *Munoz*, 536 B.R. at 884 n.12; *see also FIA Card Servs., N.A. v. Quinn (In re Quinn)*, 492 B.R. 341, 345 (Bankr. N.D. Ga. 2013) ("False pretenses is defined as '[A] series of events, activities, or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor.'").  "Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions." *Bank of Cordell v. Sturgeon (In re Sturgeon),* 496 B.R. 215, 223 (10th Cir. BAP 2013).  Like a false representation or actual fraud claim, a claim of false pretenses also requires intentional misconduct by the debtor.

Based upon much the same evidence set forth above with respect to the false representations part of Section 523(a)(2)(A), the Court also finds that the Debtor engaged in false pretenses.  Considered collectively, the Debtor's actions created an entirely "contrived and misleading understanding" of his credentials and the business arrangement between the Debtor and the McNultys.  The Debtor explicitly and implicitly (by omission) led the McNultys to believe that he was a licensed general contractor who could deal directly with the City Planning Office and obtain any necessary building permits.  For example, on September 11, 2022, the Debtor sent the McNultys an e-mail thanking them "for selecting me as your general contractor."[102]  Notably, at that time, the Debtor knew that he would have to try to find a real licensed general contractor for the Carriage House Project.  So, to avoid false pretenses, he should have said something like:

> Thank you for selecting me as your unlicensed general contractor on the Carriage House Project.  Because I am not licensed, I will have to engage another general contractor — an actual licensed general contractor.  I will let you know immediately after securing the second general contractor.  I

---

[102]     Ex. 3.

> hope that you do not mind having two general contractors:
> one licensed and one (me) not.

Of course, the Debtor did no such thing.  Instead, he concealed the role of Mr. Seiler (the selected licensed general contractor) from the McNultys for four months.[103]  The Debtor's entire *modus operandi* in the relationship with the McNultys was a sort of bait-and-switch.  As a result, the McNultys were wrongly induced to enter into the Contract and make the Deposit (which was never returned).  The Court assesses that the Debtor's conduct (or really misconduct) was intentional and done with reckless disregard.

Based upon the foregoing, the McNultys have established all the requirements of Section 523(a)(2)(A) for the false pretenses component and are entitled to a nondischargeable judgment in their favor and against the Debtor for $59,129.52.

### 3.    Actual Fraud.

The McNultys also seek to establish nondischargeability on grounds of actual fraud pursuant to Section 523(a)(2)(A).  The Supreme Court defined the parameters of the "actual fraud" part of Section 523(a)(2)(A) in *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355 (2016), wherein the Supreme Court stated:

> "Actual fraud" has two parts: actual and fraud.  The word "actual" has a simple meaning in the context of common-law fraud:  It denotes any fraud that "involv[es] moral turpitude or intentional wrong." . . .  "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." . . . Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Id*. at 360 (citations omitted).  The term "fraud" does not lend to a single and simple definition:

> Although "fraud" connotes deception or trickery generally, the term is difficult to define more precisely.  *See* 1 J. Story, Commentaries on Equity Jurisprudence § 189, p. 221 (6th ed. 1853) (Story) ("Fraud ... being so various in its nature, and so extensive in its application to human concerns, it would be difficult to enumerate all the instances in which Courts of Equity will grant relief under this head"). There is no need to adopt a definition for all times and all circumstances here . . . .

---

[103]    Although Section 10 of the Contract permitted CCI to retain subcontractors, the Contract did not expressly allow CCI to retain another general contractor.

*Id*.

Based upon much the same evidence set forth above with respect to the false representations part of Section 523(a)(2)(A), the Court also finds that the Debtor engaged in actual fraud.  The Court assesses that the Debtor engaged in "deception or trickery" in his dealings with the McNultys.  He made intentional false representations inducing the McNultys to enter into the Contract and make the Deposit.

The Debtor engaged in another type of actual fraud separate and apart from his false representations concerning his qualifications.  The Debtor and the McNultys both understood that the Deposit was being advanced by the McNultys only to be used for purposes of the Carriage House Project.  The Debtor candidly conceded throughout his trial testimony that the Deposit was not available for him to use as he pleased.  He acknowledged that he was not authorized to use the Deposit except for the Carriage House Project, and the Deposit was refundable.

But the Debtor, having fraudulently induced the McNultys to make the Deposit, intentionally drained the Deposit within one month.  None of the Deposit was spent on the Carriage House Project.  Instead, the Debtor caused CCI to spend the Deposit on other projects, corporate expenses, and the Debtor's personal expenses.  Then, the Debtor intentionally concealed the misuse of the Deposit from the McNultys.  Further, even after termination of the Contract, he strung the McNultys along by promising to repay portions of the Deposit knowing that he and CCI did not have the financial wherewithal to do so.  Coupled with the Debtor's other misconduct, the intentional misuse of the Deposit constitutes actual fraud.

Based upon the foregoing, the McNultys have established all the requirements of Section 523(a)(2)(A) for the actual fraud component and are entitled to a nondischargeable judgment in their favor and against the Debtor for $59,129.52.

## C.   The McNultys Met Their Burden to Prove Nondischargeability under Section 523(a)(4) for Embezzlement.

The McNultys assert nondischargeability of the Debtor's debt under Section 523(a)(4) by reason of embezzlement.  (Section 523(a)(4) contains two other subparts: "fraud or defalcation while acting in a fiduciary capacity" and "larceny."  However, the McNultys rely only on embezzlement.)  Embezzlement means "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."  *Kim v. Sun (In re Sun)*, 535 B.R. 358, 367 (10th Cir. B.A.P. 2015) (quoting *Klemens v. Wallace (In re Wallace)*, 840 F.2d 762, 765 (10th Cir. 1988)); *see also Adams v. Meagher (In re Meagher)*, 2012 WL 5893483 at *6 (Bankr. D. Colo. Nov. 23, 2012) (same).  This definition breaks down into five elements:

(1)   Entrustment (property lawfully obtained originally);
(2)   Of property;

(3)    Of another;
(4)    That is misappropriated (used or consumed for a purpose other than that for which it was entrusted);
(5)    With fraudulent intent.

*Alternity Cap. Offering 2, LLC v. Ghaemi (In re Ghaemi)*, 492 B.R. 321, 325 (Bankr. D. Colo. 2013) (quoting *Bryant v. Tilley (In re Tilley)*, 286 B.R. 782, 789 (Bankr. D. Colo. 2002)). *See also Meagher*, 2012 WL 5893483 at *6 (adopting list of elements); *Bombardier Cap., Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869, 876 (Bankr. D. Colo. 2004) (adopting list of elements). "Embezzlement, for purposes of 11 U.S.C. § 523 . . . 'requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud.' " *Driggs v. Black (In re Black)*, 787 F.2d 503, 507 (10th Cir.1986). The fifth element, "fraudulent intent," requires a heightened *mens rea* of "intent to permanently deprive." *Ghaemi*, 492 B.R. at *327*. Embezzlement involves an element of intent, "'the *animus furandi*' or intention to steal." *Id*.

Turning to the Section 523(a)(4) requirements, the first three elements mandate a showing of: (1) entrustment (property lawfully obtained originally); (2) of property; and (3) of another. *Ghaemi*, 492 B.R. at 325. The McNultys easily established these requirements. At the urging of the Debtor, the McNultys entrusted the Deposit ($59,375.00 of the McNultys' money) to CCI (controlled by the Debtor).

Regarding the next Section 523(a)(4) element, the Debtor plainly caused the misappropriation of the Deposit. The Deposit was provided "for the sole purpose of" the Carriage House Project.[104] It could not be used for any other purpose, including for CCI and the Debtor to spend on other projects or expenses. Both the Debtor and the McNultys swore during their testimony at the trial to their common understanding on the foregoing restrictions on the Deposit. Yet, the Debtor caused CCI to misappropriate all of the Deposit within one month (*i.e.,* by October 12, 2022) before any actual construction work had been performed.[105] None of the Deposit was used on the Carriage House Project.[106] CCI (at the direction of the Debtor) spent the Deposit, which was in CCI's general operating account, for general operating expenses, other projects, and payments of personal expenses for the Debtor and his spouse. The Debtor never disclosed to the McNultys that the Debtor spent the Deposit for expenses other than the Carriage House Project.[107] Ergo, the Debtor misappropriated the Deposit because he caused it to be "used or consumed for a purpose other than that for which it was entrusted." *Ghaemi*, 492 B.R. at 325.

The final embezzlement element requires the McNultys to prove that the Debtor

---

[104]    Undisputed Fact No. 9; Tr. I at 43-44 and 145-46.
[105]    Tr. II at 22-23. The Debtor testified: "Q. You testified that . . . within the first month, you spent the deposit on other projects, correct? A. Yes . . .";Tr. I at 51 (Debtor acknowledged that he and CCI spent entire Deposit before October 20, 2022).
[106]    Tr. I at 47. The Debtor testified: "Q. But you did not spend that money [the Deposit] on the McNultys' project, correct? A. Correct. I had other projects going on . . . ."
[107]    Tr. I at 47.

misappropriated the Deposit "with fraudulent intent." *Id*. That mandate requires a heightened *mens rea* of "intent to permanently deprive." *Id*. at 327. It is more than mere conversion which "only requires a specific intent to appropriate property." *Id*. As noted by one bankruptcy court, "[f]or purposes of section 523(a)(4) it is improper to automatically assume embezzlement had occurred merely because property is missing, since it could be missing simply because of noncompliance with contractual terms." *Glenstone Lodge, Inc. v. Treadwell (In re Treadwell)*, 459 B.R. 394, 406 (Bankr. W. D. Mo. 2011); *see also Breed's Hill Ins. Agency, Inc. v. Fravel (In re Fravel)*, 485 B.R. 1, 17-18 (Bankr. D. Mass. 2013).

The Supreme Court's decision, *Bullock v. BankChampaign, N.A.,* 569 U.S. 267 (2013), is instructive and underscores the need for the McNultys to establish that the Debtor had a culpable state of mind to prevail on its Section 523(a)(4) embezzlement claim. The *Bullock* decision centered on the meaning of "defalcation" under Section 523(a)(4) and whether it requires a culpable state of mind. To reach its conclusion, the Supreme Court drew by analogy from the intent required for embezzlement harkening back to its earlier decision in *Neal v. Clark*, 95 U.S. 704, 709 (1877). *Bullock*, 569 U.S. at 274-75. The Supreme Court explained:

> We base our approach and our answer [regarding "defalcation"] upon one of this Court's precedents. In 1878, this Court interpreted the related statutory term "fraud" in the portion of the Bankruptcy Code laying out exceptions to discharge. Justice Harlan wrote for the Court:
>
>> "[D]ebts created by 'fraud' are associated directly with debts created by 'embezzlement.' Such association justifies, if it does not imperatively require, the conclusion that the 'fraud' referred to in that section means positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, as does embezzlement; and not implied fraud, or fraud in law which may exist without the imputation of bad faith or immorality."
>
> We believe that the statutory term "defalcation" should be treated similarly.

*Bullock*, 569 U.S. at 273 (quoting *Neal,* 95 U.S. at 709).

Turning back to the particulars of this case, this is not a case of passive or constructive fraud in which the Deposit has gone missing and no one knows what happened. The missing Deposit cannot be ascribed to some sort of benign accounting error. Instead, the Debtor, knowing that he had no authority to take and use the Deposit for any purpose other than the Carriage House Project intentionally did exactly what

was prohibited:  within one month after receiving the Deposit (before any work had been done on the Carriage House Project), he took and used the Deposit for general operating expenses, other projects, and payments of personal expenses for the Debtor and his spouse.  Thus, the Debtor acted with the level of *mens rea* or intent necessary to support nondischargeability under Section 523(a)(4).  *See Chong*, 523 B.R. at 249 ("Chong then used the property for his own purposes, not the purposes for which he received the money, and did so with fraudulent intent . . . . Therefore, the Plaintiffs have shown the debt for these funds is nondischargeable as embezzlement under Section 523(a)(4).").

The Debtor has argued that he did not commit embezzlement because when he misappropriated the Deposit he intended to return it later (once CCI became successful or borrowed more money from MCA lenders).  Meanwhile, he used the Deposit on other projects so that CCI could survive.  This sort of defense just won't work.  According to the Second Circuit Court of Appeals:

> [There is a] tension between the save-the-company defense and the terms of the statute [Section 523(a)(4)].  It provides that there will be no discharge for "any debt . . . for . . . embezzlement," § 523(a)(4).  Nothing in the text narrows the traditional notion of embezzlement . . . there is no exception for financial joyriding . . . and nothing like a Robin Hood limitation excusing defendants who misuse the entrusted property of the solvent in order to save a poor company.

*Sherman v. Potapov (In re Sherman)*, 603 F.3d 11, 14 (1st Cir. 2010).  *See also U.S. v. Young*, 955 F.2d 99, 104 (1st Cir. 1992) (the "intent to return" defense is not a defense to embezzlement); *U.S. v. Coin,* 753 F.2d 1510, 1511 (9th Cir. 1985) ("The intent to return property is not a defense to embezzlement . . . nor to misapplication of funds . . . Such crimes are complete when the misapplication or embezzlement occurs."); *Houlne v. Long (In re Long)*, 478 B.R. 441, 447 (Bankr. D. Colo. 2012) ("'A conversion under which the debtor willfully and maliciously intends to borrow money for a short period of time with no intent to inflict injury but on which injury is in fact inflicted' is sufficient to prove fraudulent intent for embezzlement under Section 523(a)(4).").

Based upon the foregoing, the McNultys have established all the requirements of Section 523(a)(4) embezzlement and are entitled to a nondischargeable judgment in their favor and against the Debtor for $59,129.52.

## D.   The McNultys Met Their Burden to Prove Nondischargeability under Section 523(a)(6).

Section 523(a)(6) makes nondischargeable any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  As the text of the statute makes plain, nondischargeability under Section 523(a)(6) requires both a "willful injury" and a "malicious injury."  *Panalis v. Moore (In re Moore)*, 357 F.3d 1125,

1129 (10th Cir. 2004) ("Without proof of *both* [willful and malicious injury], an objection to discharge under [Section 523(a)(6)] must fail.") (emphasis in original); *Glencove Holdings, LLC v. Bloom (In re Bloom)*, 2022 WL 2679049, at *7 (10th Cir. July 12, 2022) (unpublished) ("to determine nondischargeability under § 523(a)(6) we must review whether Mr. Bloom caused both a willful and malicious injury.").  Stated differently, Section 523(a)(6) "requires proof of two distinct elements — the injury must be both 'willful' *and* 'malicious.'  Analyzing and applying 'willful' and 'malicious' separately is the better approach."  *First Am. Title Ins. Co. v. Smith (In re Smith)*, 618 B.R. 901, 912 (10th Cir. BAP 2020) (emphasis in original).

### 1.    <u>The Debtor Committed a Willful Injury</u>.

According to the Supreme Court, to satisfy the willful injury part of Section 523(a)(6), the McNultys must prove "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."  *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original).  The focus is whether the Debtor acted with the "actual intent to cause injury."  *Id.*  "Willful" injury is a higher standard than "'reckless' or 'negligent'" injury.  *Id.*  Thus, "debts arising [merely] from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)."  *Id.* at 64.   Explaining further, the Supreme Court observed that:

> [T]he (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts.  Intentional torts generally require the actor to intend "the *consequences* of an act," not simply "the act itself."

*Id*. at 61-62 (emphasis in original).

To establish a willful injury, a creditor may use "direct evidence that the debtor acted with the specific intent to harm a creditor or the creditor's property, or . . . indirect evidence that the debtor desired to cause the injury or believed the injury was substantially certain to occur."  *Smith*, 618 B.R. at 912.  *See also Moore,* 357 F.3d at 1129 ("to constitute a willful act under § 523(a)(6), the debtor must 'desire . . . [to cause] the consequences of his act or . . . believe [that] the consequences are substantially certain to result from it.'"); *Cocoma v. Nigam (In re Nigam)*, 780 Fed. Appx. 559, 563 (10th Cir. 2019) (unpublished table decision) (reaffirming *Moore* formulation of willful injury); *Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart)*, 229 F.3d 1163, at *3 (10th Cir. 2020) (unpublished) ("§ 523(a)(6) turns on the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur.")  It is a subjective standard.  *Smith*, 618 B.R. at 912.

The application of the Section 523(a)(6) "willful injury" standard in this Adversary Proceeding is challenging.  The McNultys did not present "direct evidence that the debtor acted with the specific intent to harm a creditor or the creditor's property." *Smith*, 618 B.R. at 912.  For example, the Court finds that the Debtor did not have personal

animus, hatred, spite, or ill-will toward the McNultys.  And, the Debtor did not pronounce orally or document in writing that he used the Deposit with the express specific subjective intent to cause injury to the McNultys.

While the Court acknowledges the lack of direct evidence, indirect evidence (including circumstantial evidence) can suffice under Section 523(a)(6).  *Mitsubishi Motors Credit of Am., Inc. v Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir. BAP 1999) ("[w]illful injury may also be established indirectly").  Per appellate precedent, "indirect evidence that the debtor desired to cause the injury or believed the injury was substantially certain to occur" satisfies the Section 523(a)(6) "willful injury" requirement. *Moore,* 357 F.3d at 1129; *Longley,* 235 B.R. at 657; *Smith,* 618 B.R. at 912.  The Tenth Circuit has referred to such principle as "subjective substantial certainty" which "extends the scope of intent well beyond the compass of evil motive, without extending it to so far as to include consequences entirely outside the actor's ken . . . ."  *Englehart*, 229 F.3d 1163, at *3 (quoting RESTATEMENT (2D) OF TORTS § 8A (ALI 1965) with approval: "A has no desire to injure C, but knows that his act is substantially certain to do so.  C is injured by [A's act].  A is subject to liability to C for an intentional tort.").

Although the issue is close, the Court determines that the indirect evidence at trial established that the Debtor "believed [] injury was substantially certain to occur" to the McNultys when he caused the Deposit to be misappropriated within one month after it was provided.  "Willful injury may [] be established indirectly by evidence of both the debtor's knowledge of the creditor's [] rights and the debtor's knowledge that the conduct will cause particularized injury."  *Longley*, 235 B.R. at 657.  Plainly, the Debtor knew (and admitted) what the Deposit was for: the sole purpose was for use on the Carriage House Project.  The Debtor knew (and admitted) that he was not authorized to use the Deposit for any other purposes such as other projects or keeping CCI afloat. The Debtor knew (and admitted) that CCI was in a very precarious financial position when it solicited and received the Deposit.  It was close to going out of business (and eventually did so just months later).  Yet, the Debtor caused the Deposit to be used within one month to pay for general operating expenses, other projects, and payments of personal expenses for the Debtor and his spouse.  Then, the Debtor concealed the use of the Deposit and affirmatively misled the McNultys by offering to return portions of the Deposit even though neither the Debtor nor CCI had the financial capacity to do so. Based on the foregoing, the Court also determines that the Debtor knew and believed his actions with respect to the Deposit were "substantially certain" to cause particularized injury to the McNultys.  So "subjective substantial certainty" is present. Again, the Debtor hid CCI's financial problems from the McNultys, used the Deposit for unauthorized and improper purposes and then concealed it all.  In doing so, the Debtor knew that the McNultys would be damaged (or at least that it was substantially certain that the McNultys would be injured) because CCI was failing.  Ultimately, CCI did fail, and none of the Deposit was ever returned to the McNultys.  Based upon the foregoing, the McNultys proved that the Debtor willfully injured the McNultys under Section 523(a)(6).

**2.**      **The Debtor Committed a Malicious Injury**.

The standard for "malicious" injury is different than "willful" injury.  Something else is required.  But what?  The most recent binding appellate decision on Section 523(a)(6) puts it this way:

> [M]alicious injury requires "evidence of the debtor's motives." *In re Smith*, 618 B.R. 901, 919 (B.A.P. 10th Cir. 2020) (quotation marks omitted).  To be malicious, the debtor must have "acted with a culpable state of mind vis-à-vis the actual injury caused the creditor."  *Id.* (quotation marks omitted). The malicious injury requires that the action be "wrongful and without just cause or excuse."  *Id.*

*Bloom*, 2022 WL 2679049, at *7.  *See also Smith*, 618 B.R. at 919.  The Tenth Circuit also explained:

> [P]ersonal animus is not a requirement for malicious injury. *Smith*, 618 B.R. at 919 (describing the requirements for malicious injury); *see also Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (explaining malicious injury means "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will (quoting *In re Stelluti*, 94 F.3d 84, 87 (2d Cir. 1996)).

*Bloom*, 2022 WL 2679049, at *7.   So, malice can be shown if the injury was wrongful and inflicted "without just cause or excuse."  *Wagner*, 492 B.R. at 55 (emphasis omitted); *Steward Software Co., LLC v. Kopcho (In re Kopcho)*, 2014 WL 3933657, at *6 (Bankr. D. Colo. Aug. 12, 2014) (same).  In assessing the presence or absence of "malicious injury," the totality of the circumstances must be examined.  *Dorr, Bentley & Pecha, CPA's, P.C. v. Pasek (In re Pasek)*, 983 F.2d 1524, 1527 (10th Cir. 1993) ("all the surrounding circumstances, including any justification or excuse offered by the debtor, are relevant to determine whether the debtor acted with a culpable state of mind" under Section 523(a)(6)); *Smith*, 618 B.R. at 919-20 (quoting *Pasek's* "all the surrounding circumstances" language; and examining "the totality of the circumstances . . . to determine if a wrongful state of mind was present" and whether the debtor committed malicious injury).

The Court has considered the totality of the circumstances.  The Debtor committed malicious injury because his conduct was wrongful and without just cause or excuse.  He misappropriated the Deposit.  He knew his conduct was wrongful and acted with a culpable state of mind.  And then he hid the misuse of the Deposit from the McNultys.

The Court received no real evidence regarding "just cause or excuse" for the Debtor's misconduct.  *See Smith*, 618 B.R. at 921 (appellate court recognized that creditor bears burden of proof but observed: "how could a bankruptcy court know about

a justification or excuse theory without a debtor presenting it to the Court?").  The Debtor did testify that he used the Deposit to keep CCI afloat by paying for other projects and operating costs.  He hoped that later (with business from other projects or MCA loans) he would be able to replenish the Deposit so that the funds could be used on the Carriage House Project.  However, that sort of general desire does not constitute "just cause or excuse" in the legal sense.  *Doe v. Boland (In re Boland)*, 596 B.R. 532, 546 (6th Cir. BAP 2019) ("[A] debtor's conduct is willful when the debtor strikes the creditor; but, the debtor's conduct is not malicious [*i.e.,* there is just cause or excuse] if the debtor acted in self-defense or in defense of others.").

A decision of the Bankruptcy Appellate Panel for the Tenth Circuit, *Columbia State Bank, N.A. v. Daviscourt (In re Daviscourt)*, 353 B.R. 674, 687-88 (10th Cir. BAP 2006) offers additional instruction on what constitutes "just cause or excuse."  In that case, the debtor "decided to divert accounts receivable collection proceeds [pledged as collateral to a bank] from the bank's lockbox without the bank's knowledge or consent." *Id*. at 680.  The proceeds were redirected by the debtor to the debtor's company.  *Id*. Like the Debtor here, the debtor explained the diversion of funds was an effort to keep his business afloat and pay the bank back.  *Id*. at 688.  The Bankruptcy Court rejected the debtor's excuse and determined that the ensuing debt was nondischargeable under Section 523(a)(6).  On appeal, the appellate panel affirmed and ruled:

> The [bankruptcy] court found that Columbia [the bank] was injured by the Daviscourts' [debtors'] conversion of proceeds because those funds were not then available to the bank. The Debtors' hope that Northwest [the debtors' company] could thereby be kept afloat was insufficient to render their intent less than "willful and malicious."  We agree.

*Id*. This Court concurs and rejects as insufficient the Debtor's effort to justify his conduct as "less than 'willful and malicious.'"  Based upon the foregoing, the McNultys proved that the Debtor maliciously injured them and their Deposit under Section 523(a)(6).  The McNultys have established all the requirements of a Section 523(a)(6) "willful and malicious injury" and are entitled to a nondischargeable judgment in their favor and against the Debtor for $59,129.52.

## E.   Additional Damages (Civil Theft) and Interest.

### 1.   The McNultys Met Their Burden to Prove Civil Theft.

In the Third Claim for Relief, the McNultys pled civil theft.  It appears that the McNultys wish to use civil theft as a basis for additional damages (treble damages) and attorneys' fees and costs with respect to the Sections 523(a)(4) and 523(a)(6) claims. Civil theft is a statutory claim that is similar to Colorado common law conversion.  In fact, conversion and civil theft are sometimes mistakenly used as synonyms.  *See Itin v. Ungar*, 17 P.3d 129, 136 n.12 (Colo. 2000), ("the [jury] instruction labelled the crime

"conversion" rather than appropriately labeling it "theft."  This mislabeling was erroneous but appears harmless . . . .").

Turning to the statutory text, COLO. REV. STAT. § 18-4-401 states the main requirements:

> (1)     A person commits theft when he or she knowingly obtains, retains, or exercises control over anything of value of another without authorization or by threat or deception . . . and:
>
> (a)     Intends to deprive the other person permanently of the use or benefit of the thing of value; [or]
>
> (b)     Knowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit . . . .

COLO. REV. STAT.  § 18-4-401(1)(a)-(b).  COLO. REV. STAT. § 18-4-403 clarifies and states:

> If any law of this state refers to or mentions larceny, stealing, embezzlement (except embezzlement of public moneys), false pretenses, confidence games, or shoplifting, that law shall be interpreted as if the word "theft" were substituted therefor; and in the enactment of sections 18-4-401 to 18-4-403 it is the intent of the general assembly to define one crime of theft and to incorporate therein such crimes, thereby removing distinctions and technicalities which previously existed in the pleading and proof of such crimes.

Per COLO. REV. STAT. § 18-4-405, civil theft is a basis for obtaining treble damages, attorneys' fees, and costs:

> All property obtained by theft, robbery, or burglary shall be restored to the owner, and no sale, whether in good faith on the part of the purchaser or not, shall divest the owner of his right to such property.  The owner may maintain an action not only against the taker thereof but also against any person in whose possession he finds the property.  In any such action, the owner may recover two hundred dollars or three times the amount of the actual damages sustained by him, whichever is greater, and may also recover costs of the action and reasonable attorney fees; but monetary damages

and attorney fees shall not be recoverable from a good-faith
purchaser or good-faith holder of the property.

The McNultys assert civil theft under both COLO. REV. STAT. §§ 18-4-401(1)(a)
and 401(1)(b).  It is evident from the text of COLO. REV. STAT. § 18-4-401(1)(a) that civil
theft under that subpart requires proving "two culpable mental states":

> (1) that the defendant knowingly obtained control over the
> owner's property without authorization; and (2) that he or she
> did so with the specific intent to permanently deprive the
> owner of the benefit of the property.

*Itin*, 17 P.3d at 134.  The Colorado Supreme Court articulated the classic formulation for
civil theft under COLO. REV. STAT. § 18-4-401(1)(a) in *Itin*, 17 P.3d at 134:

> . . . the owner of the property must prove that the taker or the
> defendant committed *acts* constituting at least one of the
> statutory crimes.  With respect to the crime of theft claimed
> here, all of its statutory elements must be proved, including
> the two culpable mental states: (1) that the defendant
> knowingly obtained control over the owner's property without
> authorization and (2) that he or she did so with the specific
> intent to permanently deprive the owner of the benefit of
> property.  *See* § 18–4–401(1).  Only upon proof of the
> criminal act of theft may the owner recover treble damages,
> fees, and costs.

*Id*. (emphasis in original).  No proof of a prior criminal conviction is necessary.  *Id*. at
135.

In *Kopcho*, 2014 WL 3933657 the Court distilled to its essence the Colorado civil
theft claim under subpart COLO. REV. STAT. § 18-4-401(1)(a) as follows:

> Two elements are required to constitute theft under Colorado
> law. The first element goes to *conduct*—exercising control
> over property of another without authorization. The second
> element goes to the *result* of the conduct—permanently
> depriving the owner of the use or benefit of the property. The
> statute prescribes a state of mind for each of the elements.
> The actor must *knowingly* exercise control over the property
> to satisfy the first element.  To satisfy the second element, at
> minimum, the actor must *knowingly* act in such a way as to
> deprive the owner of the use or benefit of the property.
> Under the Colorado criminal statutes, the criminal state of
> mind expressed [is] as "'knowingly' or 'willfully'" . . . .

41

*Id*. at *3 (emphasis in original).

The other subpart at issue, COLO. REV. STAT. § 18-4-401(1)(b), is different and sets a somewhat lower bar.  Instead of requiring an intent to "deprive the other person permanently of the use or benefit of the thing of value," COLO. REV. STAT. § 18-4-401(1)(b) applies if the Debtor "[k]nowingly uses, conceals, or abandons the thing of value in such manner as to deprive the other person permanently of its use or benefit . . ."  Put another way:

> . . . the [] burden to prove the defendant's culpable mental state under section 18-4-401(1)(b) is entirely different than under 18-4-401(1)(a).  The "knowingly uses" element does *not* require that the defendant have a "conscious objective to deprive another person of the use or benefit of the construction trust funds, but instead requires the [defendant] to be aware that his manner of using the trust funds is practically certain to result in depriving another person of the use or benefit of the funds."  That is, if a person "knowingly obtains control over the property of another without authorization and, *even though not intending to deprive the other person permanently of the use or benefit of the property*, nonetheless knowingly uses the property in such manner as to deprive the other person permanently of the use or benefit of the property," he commits theft within the meaning of section 18-4-401(1)(b). Thus, a finding of a lack of intent to permanently deprive under section 18-4-401(1)(a) is *not* dispositive of whether the contractor possessed the culpable mental state of "[k]nowingly uses" in section 18-4-401(1)(b).

*Franklin Drilling and Blasting Inc. v. Lawrence Constr. Co.*, 463 P.3d 883, 888 (Colo. App. 2018) (citations omitted) (emphasis in original).

The Court finds that the McNultys have met their burden to prove civil theft under both COLO. REV. STAT. §§ 18-4-401(1)(a) and 401(1)(b).  The intent to permanently deprive required under COLO. REV. STAT. § 18-4-401(1)(a) matches closely with the elements required for claims under Sections 523(a)(4) and 523(a)(6).  In other words, by establishing their claims under Sections 523(a)(4) and 523(a)(6), the McNultys effectively proved civil theft under COLO. REV. STAT. § 18-4-401(1)(a).  *Chong*, 523 B.R. at 251 ("The basic elements of 'theft' under Colorado statute parallel the standards applied in the Tenth Circuit to determine whether an injury is willful and malicious under Section 523(a)(6).") (quoting *Tague & Beem, LLC v. Tague (In re Tague)*, 137 B.R. 495, 502 (Bankr. D. Colo. 1991)); *Kopcho*, 2014 WL 3933657, at *5 (determination of civil theft under COLO. REV. STAT. § 18-4-401 is "sufficient to establish the Defendant's liability for embezzlement under [Section 523(a)(4) of] the Bankruptcy Code.").  And, the McNultys proved per COLO. REV. STAT. § 18-4-401(1)(b) that the Debtor "[k]nowingly

use[d] . . . the thing of value [the Deposit] in such manner as to deprive the other person permanently of its use or benefit" because the Deposit is now gone.  *See Chong*, 523 B.R. at 252; *see also Marvel Concrete, Inc. v. Helmke (In re Helmke)*, 398 B.R. 38, 40 (Bankr. D. Colo. 2008) ("The Court's finding that Defendants had the subjective hope and intent to keep their business open so that all creditors would eventually be paid does not negate its finding that they knowingly used funds held in trust under the Mechanics' Lien Trust Fund Statute in a manner that was practically certain to deprive Plaintiff of the use and benefit of *those trust funds*.  This latter finding is that which is required to establish civil theft . . . .").

Because the McNultys met their burden to establish civil theft, they are also entitled to recover "three times the amount of the actual damages sustained . . . and may also recover costs of the action and reasonable attorney fees."  COLO. REV. STAT. § 18-4-405.  *See Trans-West, Inc. v. Mullins (In re Mullins)*, 2021 WL 2679137, at *8 (10th Cir. BAP June 30, 2021) (unpublished) ("[C]ourts have held that an award of treble damages and attorneys fees to a prevailing plaintiff is mandatory upon proof of all of the elements of civil theft [under COLO. REV. STAT. §§ 18-4-401 and 405].");  *In re Krupka*, 317 B.R. 432, 439 (Bankr. D. Colo. 2004) (same).  The amount of treble damages the McNultys are entitled to tallies to $177,388.56 (calculated as $59,129.52 X 3 = $177,388.56).

### 2.      The McNultys Are Entitled to Interest.

The McNultys have requested the imposition of both pre-judgment and post-judgment interest.  With respect to pre-judgment interest, the McNultys ask for pre-judgment interest under COLO. REV. STAT. § 5-12-102(1)(a),[108] which states:

> . . . when there is no agreement as to the rate thereof, creditors shall receive interest as follows:
>
> (a)      When money or property has been wrongfully withheld, interest shall be an amount which fully recognizes the gain or benefit realized by the person withholding such money or property from the date of wrongful withholding to the date of payment or to the date judgment is entered, whichever first occurs; or at the election of the claimant.
>
> (b)      Interest shall be at the rate of eight percent per annum compounded annually for all moneys or the value of all property after they are wrongfully withheld or after they become due to the date of payment or to the date of judgment is entered, whichever occurs first.

---

[108]      Tr. II at 53.

However, the McNultys have not established that the state law for pre-judgment interest applies in a bankruptcy nondischargeability action.

The majority view is that federal law governs the topic. *MacArthur Co. v. Cupit (In re Cupit)* 514 B.R. 42, 57 (Bankr. D. Colo. 2014). The *Cupit* court insightfully explained:

> Although there is some dispute in the case law, it appears that most courts apply federal law in determining a party's right to prejudgment interest. *See Diamond v. Bakay (In re Bakay),* 454 Fed. Appx. 652, 654 (10th Cir. 2011) (unpublished) (applying federal law in nondischargeability case); *Lapin v. Glatstian (In re Glatstian),* 215 B.R. 495, 498 (Bankr. D. N.J. 1997) (same); *Sunclipse, Inc. v. Butcher (In re Butcher),* 200 B.R. 675, 680 (Bankr. C. D. Cal. 1996) (same). *But see Pritchard Concrete, Inc. v. Barnes (In re Barnes),* 377 B.R. 289, 299 (Bankr. D. Colo. 2007) (applying state law). Under federal law, prejudgment interest may generally be awarded if "1) the award of prejudgment interest would serve to compensate the injured party, and 2) the award of prejudgment interest is otherwise equitable." *In re Bakay,* 454 Fed. Appx. at 654 (citing *In re Inv. Bankers, Inc.,* 4 F.3d 1556, 1566 (10th Cir.1993)). "Thus under federal law prejudgment interest is ordinarily awarded, absent some justification for withholding it." *Id.* (citing *U.S. Indus., Inc. v. Touche Ross & Co.,* 854 F.2d 1223, 1256 (10th Cir. 1988)). However, prejudgment interest is not recoverable as a matter of right but is instead governed by considerations of fundamental fairness. *Id.* The decision to award prejudgment interest is a matter left to the sound discretion of the trial court. *In re Butcher,* 200 B.R. at 680.

*Cupit*, 514 B.R. at 57; *see also Sun*, 535 B.R. at 370 (an award of pre-judgment interest in a Section 523(a) nondischargeability action is "a matter within the trial court's discretion").

The Court finds, in the exercise of its discretion, that pre-judgment interest in not warranted under the circumstances. The base amount of the damages ($59,129.52) was calculated on the amount of the Default Judgment ($65,149.42) less certain deductions. But, the amount of the Default Judgment already included at least $5,031.10 in pre-judgment interest.[109] So, at least to some extent, the McNultys' request would amount to asking for pre-judgment interest on top of pre-judgment interest. That would violate principles of fundamental fairness. And, besides, the McNultys did not provide the Court with an analysis and calculation of the specific

---

[109]   Ex. 12.

amount of requested pre-judgment interest.  Further, factually, the McNultys testified that they obtained a loan for the Deposit but did not identify the interest rate on that loan – a factor which would bear on fair interest compensation.  Based on the foregoing, the Court declines an award of pre-judgment interest to the McNultys.

Post-judgment interest in another story.  28 U.S.C. § 1961 sets the rate of interest "allowed on any money judgment . . . ."  The McNultys are entitled to such post-judgment interest.  *Riebesell*, 586 F.3d at 794; ("Because a bankruptcy court is part of the district court, [28 U.S.C. § 1961] applies to bankruptcy proceedings") (quoting *Pester Refining Co. v. Ethyl Corp. (In re Pester Refining Co.)*, 964 F.2d 842, 849 (8th Cir. 1992)); *Chong*, 523 B.R. at 253.

## VIII.   <u>Conclusion and Orders</u>.

For the reasons set forth above, the Court ORDERS that:

Pursuant to Section 523(a)(2)(A), the Debtor is indebted to the McNultys in the amount of $59,129.52, which amount is nondischargeable under Section 523(a)(2)(A);

Pursuant to Section 523(a)(4), the Debtor is indebted to the McNultys in the amount of $177,388.56 ($59,129.52 trebled), which amount is nondischargeable under Section 523(a)(4);

Pursuant to Section 523(a)(6), the Debtor is indebted to the McNultys in the amount of $177,388.56 ($59,129.52 trebled), which amount is nondischargeable under Section 523(a)(6); and the Court:

FURTHER ORDERS that the foregoing amounts are not awarded cumulatively, and Judgment shall enter in favor of the McNultys and against the Debtor in the amount of $177,388.56, which is non-dischargeable;[110]

FURTHER ORDERS that post-judgment interest shall accrue on the foregoing amount under 28 U.S.C. § 1961 from the date of the entry of Judgment;

FURTHER ORDERS that the Court denies the McNulty's request that the Court impose pre-judgment interest on the Judgment; and

FURTHER ORDERS that, in the event the McNultys, as the prevailing parties, wish to pursue attorneys' fees and costs against the Debtor, the McNultys shall submit a Motion for Attorneys' Fees and Costs (complete with citations to supporting facts and law) within 14 days from the date of the entry of this Memorandum Opinion After Trial. Additionally, in the event that the McNultys, as the prevailing parties wish to pursue their costs pursuant to 28 U.S.C. § 1920 and Fed. R. Bankr. P. 7054(b)(1), they shall submit

---

[110]    The Court recognizes that the Amended McNulty Claim is for $260,597.68.  However at the trial in this Adversary Proceeding, the McNultys did not prove entitlement to the higher amount.

their Bill of Costs to the Clerk of the Court within 14 days from the date of this Memorandum Opinion After Trial.[111]

      DATED: February 10, 2025

                                  BY THE COURT:

                                  Thomas B. McNamara,
                                  United States Bankruptcy Judge

---

[111]    The Court neither encourages nor discourages the McNultys from initiating additional litigation over attorneys' fees and costs.  The decision is theirs.  However, the Court observes from its own experience that collateral litigation over attorneys' fees and costs often devolves into a life of its own requiring significant time and expense.  Oftentimes, the exercise may not be economically productive especially if the defendant target is impecunious.